UNITED STATES of America, Plaintiff,

v.

Jesus ESTRADA, a/k/a Jose Rufigo Gomez, Defendant.

No. CR 5–87–22.

United States District Court, D. Minnesota, Fifth Division.

March 31, 1988.

As Corrected April 13, 1988.

Richard E. Vosepka, U.S. Atty., Mpls., Minn., for U.S.

Barry Voss, Mpls., Minn., for defendant.

John R. Steer, Gen. Counsel, U.S. Sentencing Commission, Washington, D.C., for amicus curiae.

Benson B. Weintraub, Sonnett, Sale & Kuehne, P.A., Miami, Fla., and Joseph S. Friedberg, Mpls., Mn., Counsel for the National Association of Criminal Defense Lawyers, Amicus Curiae.

## MEMORANDUM OPINION

HEANEY, Circuit Judge, Sitting by Designation.

Jesus Estrada moves this Court for an order precluding application of the recently promulgated Federal Sentencing Guidelines and Policy Statements (hereinafter guidelines) to his case on the ground that they are unconstitutional.

This Court finds the guidelines to be in violation of the separation of powers, both because they impermissibly grant substantial legislative power to the judicial branch of government and because they require federal judges to perform duties which would substantially impair the ability of the judiciary to function in an impartial manner.

The guidelines are, however, severable from other sections of the Sentencing Reform Act, and important sections remain valid. Thus, in accordance with the detailed instructions set forth in the remaining sections of the Act, the Court finds that it must impose a "real time sentence" and must state its reasons for imposing that sentence. Moreover, provisions of the Act providing for appellate review remain applicable.

## I. BACKGROUND

On December 15, 1987, a Minnesota grand jury returned a one-count indictment against Estrada, charging him with possession of 600 grams of cocaine in violation of 21 U.S.C. § 841(a)(1). On December 30, 1987, Estrada filed a number of pre-trial motions, including motions requesting orders declaring the guidelines unconstitutional and the minimum mandatory sentence in 21 U.S.C. § 841(b)(1)(B) inapplicable.[1] The Court, believing that Estrada lacked standing to challenge the constitutionality of the guidelines until he pled guilty or had been found guilty of an offense, deferred ruling on them.[2] On January 27, 1988, after a two-day trial, a jury found Estrada guilty as charged in the indictment. Thereafter, the Court requested and received briefs from the parties on the issue of the constitutionality of the guidelines. In addition, the Court received amicus curiae briefs from the United States Sentencing Commission and the National Association of Criminal Defense Lawyers.

## II. STANDING

Estrada has standing to challenge the guidelines. He has been tried and convicted of an offense to which the guidelines apply. Moreover, although the statute under which Estrada has been convicted subjects him to a mandatory minimum imprisonment term of five years, it would appear application of the guidelines requires a sentence in excess of that. Thus, the increased sentence Estrada would likely be required to serve under the guidelines represents concrete injury sufficient to establish standing. *Cf. Federal Defenders of San Diego, Inc. v. United States Sentencing Commission,* 680 F.Supp. 26 (D.D.C. 1988) (denying federal defenders standing to challenge the guidelines).

## III. STATUTORY FRAMEWORK

The United States Sentencing Commission was created by Congress as part of the Sentencing Reform Act (the Act) included in the Comprehensive Crime Control Act of 1984. Pub.L. No. 98–473, Title II, 98 Stat. 1988 (1984). Its seven voting members are appointed by the President with the advice and consent of the Senate and may be removed by the President "for neglect of duty or malfeasance in office or for other good cause shown."[3] 28 U.S.C.

---

**1.** Estrada challenges the minimum mandatory sentence on the grounds that 18 U.S.C. § 4205(a) and (b)(1) authorize imposition of a lesser sentence and that possession of more than 500 grams of cocaine is an element of the crime with which he was charged that was not included in the indictment. We reject both arguments.

The statute under which Estrada was convicted clearly requires the court to impose a minimum sentence of five years imprisonment. *See* 21 U.S.C. § 841(b)(1)(B) (requiring sentence of "not less than five years"). The general sentencing provisions of 18 U.S.C. §§ 4205(a) and (b)(1) do not provide this court with authority to depart from the specific minimum set by statute.

In addition, the indictment specifically charged Estrada with possession of 600 grams of cocaine with intent to distribute. The potential punishment to which he was exposed if convicted was, therefore, evident from the indictment. Moreover, at trial, the government's requested jury instruction number 17 would have allowed the jury to convict Estrada if it found that he possessed any amount of cocaine. The Court refused the instruction, stating:

Court: I am going to change the elements instruction to read that defendant Jesus Estrada possessed 600 grams of a Schedule I[I] controlled substance.

Now my reasons for it are that [it] is ... number one, alleged in the indictment. Number two, if you proved any possession at trial you proved he possessed 600 grams.

\* \* \* \* \* \*

Thirdly and perhaps most importantly, I do not want to get into any disagreement if the defendant should be found guilty and it comes to the sentencing process, that we are going to be arguing that the quantity of drugs

\* \* \* \* \* \*

is either above or below that level.

**2.** *But see United States v. Ruiz–Villanueva,* 680 F.Supp. 1411 (S.D.Cal.1988) (allowing defendant to challenge the guidelines prior to plea or conviction on the ground that they would affect any plea negotiations); *United States v. Arnold,* 678 F.Supp. 1463 (S.D.Cal.1988) (same).

**3.** The designee of the Attorney General of the United States and the Chairman of the United States Parole Commission are ex officio, nonvoting members of the Commission, as well. *See* 28 U.S.C. § 991(a).

§ 991(a). Of the seven voting members, three must be federal judges selected after considering a list of six judges recommended by the Judicial Conference.[4] *Id.*

The Commission was charged by Congress with promulgating and distributing guidelines and policy statements for the courts to use in imposing sentences in criminal cases. 28 U.S.C. § 994(a)(1). The guidelines were to "provide certainty and fairness in meeting the purposes of sentencing" while avoiding unwarranted disparities and "maintaining sufficient flexibility to permit individualized sentences." 28 U.S.C. § 991(b)(1)(B). More specifically, the Act directed the Commission to establish guidelines covering a number of sentencing determinations, including whether to impose a term of imprisonment and the length of such a term, whether to impose a term of probation and the length and conditions of any such term, whether to impose a fine and the amount of such fine, whether to require a term of supervised release after a term of imprisonment and the length of such supervision, whether multiple sentences should run consecutively or concurrently, whether to modify a sentence, and whether to accept a plea agreement. 28 U.S.C. § 994(a)(1)–(3).

In addition, the Act sets forth a number of guidelines for the Commission to follow.

First, if the guidelines specify a sentence that includes a term of imprisonment, the maximum of the specified term "shall not exceed the minimum * * * by more than 25 percent or 6 months." 28 U.S.C. § 994(b). Second, the Commission must consider the relevance of certain specifically enumerated factors and take them into account in establishing guidelines to the extent it determines they are relevant.[5] 28 U.S.C. § 994(c) and (d). Third, the Commission is to assure that the prison terms in the guidelines reflect the "general inappropriateness" of considering certain specified factors.[6] 28 U.S.C. § 994(e). Fourth, the Commission is to take into account the nature and capacity of available correctional facilities, to recommend changes in such facilities necessitated by the guidelines, and to formulate guidelines that will "minimize the likelihood that the Federal prison population will exceed the capacity of the Federal prisons." 28 U.S.C. § 994(g). Finally, the Act specifies the weight the Commission must give to particular factors or circumstances. *See* 28 U.S.C. § 994(h)–(n). For example, section 994(h)(1) requires the Commission to assure the guidelines specify a substantial term of imprisonment for defendants with "two or more prior Federal, State, or local felony convictions for

---

**4.** The relevant statutory provision states:

There is established as an independent commission in the judicial branch of the United States a United States Sentencing Commission which shall consist of seven voting members and one nonvoting member. The President, after consultation with the representatives of the judges, prosecuting attorneys, defense attorneys, law enforcement officials, senior citizens, victims of crime, and others interested in the criminal justice process, shall appoint the voting members of the Commission, by and with the advice and consent of the Senate, one of whom shall be appointed, by and with the advice and consent of the Senate, as the Chairman. At least three of the members shall be Federal judges selected after considering a list of six judges recommended to the President by the Judicial Conference of the United States. Not more than four of the members of the Commission shall be members of the same political party. The Attorney General, or his designee, shall be an ex officio, nonvoting member of the Commission. The Chairman and members of the Commis-

sion shall be subject to removal from the Commission by the President only for neglect of duty or malfeasance in office or for other good cause shown.

28 U.S.C. § 991(a).

**5.** Such factors include the grade of the offense, aggravating and mitigating circumstances under which the offense was committed, the nature and degree of harm caused by the offense, the community view of the gravity of the offense, public concern about the offense, the deterrent effect of the sentence, the current incidence of the offense in the community and in the nation, the age, educational, mental, emotional and physical condition of the defendant, the defendant's employment record, family and community ties, role in the offense, criminal history, and the degree to which the defendant depends on criminal activity to make a living. 28 U.S.C. § 994(c) and (d).

**6.** Among these factors are "the education, vocational skills, employment record, family ties and responsibilities, and community ties of the defendant." 28 U.S.C. § 994(e).

offenses committed on different occasions," while section 994(j) requires the Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." [7]

Finally, the Act imposes on the Commission continuing duties concerning the administration and revision of the guidelines. Specifically, the Act requires the Commission to gather data on sentences imposed pursuant to the guidelines, to solicit comments on the guidelines, to consider petitions by defendants to change the guidelines under which they were sentenced, and to report the results of such efforts to Congress and other parties. *See* 18 U.S.C. § 994(*o*)–(w).

The guidelines are not advisory. Rather, federal judges must

> impose a sentence of the kind, and within the range [set forth in the guidelines] ... unless [the judge] finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, that was not adequately taken into consideration by the Sentencing Commission in formulating the guidelines [and] that should result in a sentence different from that described.

18 U.S.C. § 3553(b) (as amended by Pub.L. No. 100–182, Dec. 7, 1987).

## IV. *THE CONSTITUTIONAL CHALLENGE*

Estrada argues that the guidelines are unconstitutional because service of federal judges on the Commission violates the separation of powers doctrine and because they involve an excessive delegation of legislative authority. [8]

Under the Constitution, the responsibility for and the authority to make law rests within the legislative branch. Accordingly, only the legislative branch possesses the ultimate authority to define federal crimes and to prescribe the punishment for those crimes. *United States v. Wiltberger,* 18 U.S. (5 Wheat.) 76, 95, 5 L.Ed. 37 (1820). Congress, however, may delegate that authority consistent with the requirements of the Constitution. Indeed, Congress has historically chosen to prescribe maximum sentences for most federal crimes and to leave to individual judges the task of determining the actual sentence imposed. It has done so for a variety of reasons.

Some of the reasons for leaving individual judges wide discretion are based on the idea that rehabilitation should serve as a philosophical basis for imposition of punishment. Other reasons have continuing validity, even though the idea that imprisonment may serve rehabilitative goals has largely been abandoned. Foremost is the recognition that extraordinarily important and complex sentencing decisions often must be made at a time when passions in

---

**7.** Many studies have indicated that the recidivism rate among probationers is very low. One of the most comprehensive of these studies was conducted by Chief Judge G. Thomas Eisele of the Eastern District of Arkansas. Under his direction, the probation office of the Eastern District of Arkansas examined the records of all persons placed on probation in the district for a period of ten years. Of the 2,280 persons studied, only 70, or about three percent, had their probation revoked for a violation. The record of the probationers was four times better than that of parolees. Moreover, first-time offenders accounted for only five percent of the violators. The study also indicated that even those in the highest risk group of offenders—younger individuals from urban areas with a prior record of imprisonment—showed minimal rates of recidivism.

**8.** Because we find that the guidelines are unconstitutional on the ground that they violate the doctrine of the separation of powers, we need not reach the issue whether they involve an excessive delegation of Congressional authority without adequate standards governing that delegation. We note, however, that of the cases that have addressed the issue, none has found the guidelines unconstitutional on delegation grounds. *See United States v. Ruiz–Villanueva,* 680 F.Supp. 1411 (S.D.Cal.1988); *United States v. Arnold,* 678 F.Supp. 1463 (S.D.Cal.1988). *But cf.* Note, *The Constitutional Infirmities of the United States Sentencing Commission,* 96 Yale L.J. 1363 (1987) (arguing that the importance of the liberty interest at stake and the non-technical nature of the decision requires a heightened scrutiny of the delegation and that the guidelines do not pass such scrutiny).

the community are exceedingly high. Therefore, it was thought wise and just to place such a decision in the hands of the most politically insulated branch of government—the judiciary. In addition, the importance of the sentencing decision required that it be placed in the hands of one individual who would bear the responsibility for it. Indeed, the responsibility is a heavy one. Of all of the tasks of a district judge, none is more difficult than imposing a sentence of imprisonment. Finally, since sentencing involves a most extreme deprivation of personal liberty, it calls for a highly individualized process. Accordingly, rather than attempting to prescribe punishments that take into account the entire range of possible human conduct and all its underlying motivations, Congress chose to delegate the task to judges, who, although imperfect at times, could exercise wisdom and insight far superior to any that could be captured in the abstract and codified or computerized.

Congress, however, has decided to reallocate its sentencing authority. Individual judges are no longer primarily responsible for determining the punishment to be imposed. Instead, such responsibility has been turned over to the Sentencing Commission, which will perform the legislative task of prescribing a system of punishment which will replace the large sentencing ranges of the past with very narrow ranges within which judges must sentence. That this Court may question the wisdom of this approach is irrelevant. The task before this Court is to determine whether Congress has acted in a manner consistent with the Constitution.

■ The Sentencing Commission claims that it is a part of the judicial branch. The Department of Justice claims the Commission is in the executive branch. (Alternatively, both claim the Commission is a hybrid independent agency.) Both the Commission and the Justice Department candidly recognize the constitutional infirmities of the others characterization. At the outset, this Court notes that this disagreement over the fundamental issue of the placement of the Commission is indicative not only of great disorganization in presentation but of even deeper constitutional infirmities. This Court will address the contentions of the Commission and the Justice Department in turn.[9]

## V. THE GUIDELINES IMPERMISSIBLY GRANT SUBSTANTIVE LEGISLATIVE POWER TO THE JUDICIAL BRANCH

We first address the constitutionality of the Commission as a part of the judicial branch.

Implicit in the concept of the separation of powers is the idea that federal judges are not to legislate, nor are they to execute the law. As James Madison stated:

> Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for *the judge* would then be *the legislator*. Were it joined with the executive power, *the judge* might behave in all the violence of *an oppressor*.

*THE FEDERALIST* No. 47 (Madison quoting Montesquieu).

The framers carefully considered and rejected assigning to the judiciary powers that would extend beyond the traditional function of adjudicating cases. Specifically, the idea of a "Council of Revision" to be composed of the executive and members of the federal judiciary exercising the power to veto and/or revise legislative acts was placed before the Constitutional Convention. Fears that this broader non-judicial role might lead to partiality caused the Convention to decisively reject the proposal. *See* P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, *Hart and Wechsler's The Federal Courts and the Federal System* 8 (2d ed. 1973) (hereinafter "Bator"). The

---

**9.** Although the terms of the Sentencing Reform Act place the Commission within the judicial branch, this Court is not bound by that characterization. "To allow a simple majority of Congress to have final say on matters of constitutional interpretation is * * * fundamentally out of keeping with the constitutional structure." *Oregon v. Mitchell,* 400 U.S. 112, 205, 91 S.Ct. 260, 305, 27 L.Ed.2d 272 (1970) (Harlan, J., concurring and dissenting).

Federalist explained the rejection of the Council in the following terms:

> Two strong reasons may be imagined for this [rejection of the Council of Revision]. One is that the Judges, who are to be the interpreters of the law, might receive an improper bias from having given a previous opinion in their revisionary capacities; the other is that being often associated with the executive, they might be induced to embark too far in the political views of that magistrate, and thus a dangerous combination might by degrees be cemented between the executive and judiciary departments. It is impossible to keep the judges too distinct from every other avocation than that of expounding the laws. It is peculiarly dangerous to place them in a situation to be either corrupted or influenced by the executive.

*THE FEDERALIST* No. 73 (A. Hamilton).

The rationale for preventing the judiciary from exercising legislative power is a strong one. As the framers understood, if an individual has the propensity to make a bad or overreaching law as a legislator, that individual is unlikely to declare it invalid or limit its application as a judge. As Alexander Hamilton stated:

> From a body which has had even a partial agency in passing bad laws we could rarely expect a disposition to temper and moderate them in the application. The same spirit which had operated in making them would be too apt to operate in interpreting them; still less could it be expected that men who had infringed the Constitution in the character of legislators could be disposed to repair the breach in the character of Judges.

*THE FEDERALIST* No. 81 (A. Hamilton).

▆ Nevertheless, the Supreme Court has recognized the separation of powers does not require "three airtight departments of government." *Nixon v. Administrator of General Services,* 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1977). Because there is great overlap between powers and responsibilities of the executive and legislative branches, expansive delegations to the executive by Congress have been tested with some leniency.[10] Yet, "[O]f the three branches, it is the role of the judiciary that the Constitution most clearly and tightly confines within narrow borders." *In re Sealed Case,* 838 F.2d 476, 516 (D.C.Cir.1988). Accordingly, in interpreting Article III, the Supreme Court has strictly limited the judiciary's powers to "interpreting and applying [laws] in cases properly brought before the courts," *Massachusetts v. Melon,* 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923), and to "determine[ing] actual controversies arising between adverse litigants duly instituted in courts of proper jurisdiction." *Muskrat v. United States,* 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 (1911). In general, it is well established the judiciary may not be delegated non-judicial governmental duties.[11]

10. As Justice Jackson said: "There is a twilight in which [the President] and Congress may have concurrent authority, or in which its distribution is uncertain.... In this area, any actual test of power is likely to depend on the imperatives of events and contemporary imponderables rather than abstract theories of law." *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 637, 72 S.Ct. 863, 871, 96 L.Ed. 1153 (1952) (Jackson, J., concurring).

Nevertheless, where executive or congressional action obviously exceeds enumerated powers, the Court will strike it down. Indeed, the Court so held in *Youngstown,* since it found that the President's seizure of the steel mills amounted to "lawmaking" and thus fell outside the powers given by Article II. *Id.* at 587–88, 72 S.Ct. at 866–67. Similarly, the Court held the Gramm–Rudman–Hollings Act unconstitutional because it resulted in a "congressional usurpation of Executive Branch functions." *Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 3189, 92 L.Ed. 2d 583 (1986).

11. Illustrative of the comparatively narrow limits of judicial power and the principle that judges should not perform non-judicial governmental functions is the rule against rendering advisory opinions. An advisory opinion offers the judge's views on an issue outside the sphere of an actual case or controversy and thus outside the range of judicial action authorized by Article III. As early as 1793, the Supreme Court refused to issue an advisory opinion when asked to advise President Washington on several matters of foreign policy. *See* Letter from the Justices of the Supreme Court to President Washington (August 8, 1793) *reprinted in* Bator at 65–66. *See also Muskrat,* 216 U.S. at 362, 31 S.Ct. at 255; Frankfurter, *A Note on Advisory Opinions,* 37 Harv.L.Rev. 1002 (1924). The rule

In *Hayburn's Case*, 2 U.S. (2 Dall.) 408, 1 L.Ed. 436 (1792), an act of Congress authorized the members of the judiciary to settle pension claims and the claims of widows and orphans. *See* Act of March 23, 1792, 1 Stat. 243 (1792). The Act subjected these determinations, first, to review by the Secretary of War and, second, to the revision of Congress. Even though these duties were adjudicative in nature, they were subject to review by the other branches of government. The question, therefore, arose whether these duties were properly within the authority of the judicial branch.

At that time, the justices of the Supreme Court also actively sat as circuit court judges. In that capacity, all but one of the justices found that the assignment of this task to judges was improper. Specifically, the justices sitting as circuit judges found that by subjecting their decision to review by the executive and/or Congress, the Act rendered their task "non-judicial" and outside the ambit of their authority as defined in Article III of the Constitution.

The judges of the Circuit Court for the District of New York, including Chief Justice Jay and Justice Cushing wrote:

> [B]y the Constitution of the United States, the government thereof is divided into three distinct and independent branches, and that it is the duty of each to abstain from, and to oppose, encroachments on either. That neither the legislative nor the executive branches, can constitutionally assign to the judicial any duties, but such as are properly judicial, and to be performed in a judicial manner.

*Hayburn's Case*, 2 U.S. at 409 n. (a).

Although the statute at issue in *Hayburn's Case* was repealed before the Supreme Court could reach the merits, the view that this task was non-judicial and could not be assigned to federal judges was later affirmed, without opinion, by the Supreme Court in *United States v. Todd*, (U.S. February 17, 1794), *cited in Note Inserted by Order of the Court in United States v. Ferreira*, 54 U.S. (13 How.) 40, 52, 14 L.Ed. 42 (1851). *See generally* W. Ritz, *United States v. Yale Todd*, 15 Wash. & Lee L.Rev. 220 (1958).

In *United States v. Ferreira*, 54 U.S. (13 How.) at 52, the Supreme Court again faced a congressional attempt to delegate to the judiciary an essentially non-judicial function. *Ferreira* involved a treaty provision for satisfaction of claims of inhabitants of Florida arising out of the American Army's operation in that territory during a recent war with Spain. Congress passed an Act to give force to the treaty which provided that territorial judges were "to receive and adjust all claims arising within their respective jurisdictions." In 1849, a special law was passed authorizing the District Judge of the United States District Court for the Northern District of Florida to receive and adjudicate a few specific remaining claims not yet satisfied under prior enactments which had expired. The judge's determinations were subject to review by the Secretary of the Treasury. *See* 9 Stat. 788 (1849).

Before the Court was the narrow question of whether an appeal lay to the Supreme Court from the decision of the district judge. The Court avoided constitutional problems by construing the statute as a grant of power *personally* to the district judge as an officer of the executive branch and not as a member of the Article III judiciary. Therefore, the Court ruled that an appeal did not lie.

In dicta, the Court carefully reviewed *Hayburn's Case*, and, in an addendum, the result and implications of *United States v. Todd*. On this authority, the court suggested that the task given the district judge was executive in nature and, as such, could not properly be conferred on the courts "*eo nomine*," (i.e. on courts as courts or on the judicial branch), and thus it was improper for a judge as a member of the judicial branch to process this claim.[12]

---

against advisory opinions remains a vital constitutional principle. *See Princeton Univ. v. Schmid*, 455 U.S. 100, 102, 102 S.Ct. 867, 868, 70 L.Ed.2d 855 (1982), *Buckley v. Valeo*, 424 U.S. 1, 11, 96 S.Ct. 612, 630, 46 L.Ed.2d 659 (1976),

*Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937).

**12.** Specifically, the Court stated:

Whereas *Hayburn's Case, Todd,* and *Ferreira* involved delegations of executive authority, the Supreme Court has also held that delegation of legislative tasks to the judiciary is improper. In *Keller v. Potomac Electric Co.,* 261 U.S. 428, 43 S.Ct. 445, 67 L.Ed. 731 (1922), it stated:

> [L]egislative or administrative jurisdiction, it is well settled can not be conferred on this Court either directly or by appeal. * * * The principle * * * enforced on reason and authority is that the jurisdiction of this Court and of the inferior federal courts of the United States ordained and established by Congress under and by virtue of the third article of the Constitution is limited to cases and controversies in such form that the judicial power is capable of acting upon them and does not extend to an issue of constitutional law framed by the Congress for the purpose of invoking the advice of this Court without the real parties, or to administrative or legislative issues or controversies.

*Keller v. Potomac Electric Co.,* 261 U.S. at 444, 43 S.Ct. at 448, 449. *See also Gordon v. United States,* 117 U.S. 697 (1864) (reported in Appendix) (Congress may not confer on Court of Claims or Supreme Court appellate jurisdiction to decide cases whose judgments would not be paid until an appropriation is made by Congress).

This interpretation of *Hayburn's Case* and *Ferreira* has recently been affirmed in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) where the Court, citing *Hayburn's Case* and *Ferreira,* stated:

> This Court has not hesitated to enforce the principle of the separation of powers embodied in the Constitution when its application has proved necessary for the decisions of cases or controversies before it. The Court has held that executive or administrative duties of a non-judicial nature may not be imposed on judges holding office under Art. III of the Constitution.

424 U.S. at 123, 96 S.Ct. at 684.

In summary, the intentions of the Framers, the narrow grant of power embodied in Article III, and the caselaw demonstrate the powerful limits on the ability of the judiciary to perform non-judicial functions.

A. The Sentencing Guidelines Are a Delegation to the Judiciary of Legislative Authority

The authority conferred upon the Commission is clearly legislative. In *Keller v. Potomac Electric Co.,* 261 U.S. 428, 43 S.Ct. 445, 67 L.Ed. 731 (1922), the Supreme Court compared the judicial and legislative functions. The case involved an appeal by a utility of a valuation ruling by the Public Utilities Commission for the District of Columbia. The statute under which the appeal was taken vested original appellate jurisdiction in the Supreme Court of the District of Columbia which was authorized to "vacate, set aside, or modify any such decision or order [of the Utilities Commission] on the ground that the valuation, rate or rates ... or other thing complained of fixed in such order is unlawful, inadequate, or unreasonable." The Supreme Court for the District upheld the findings of the Commission.

On appeal to the United States Supreme Court, the case was dismissed. The Court held that the provisions of the statute authorizing it to review the entire record and to change the rates or valuations set by the

---

This law [involved in *Hayburn's Case*] is the same in principle with the one we are now considering, with this difference only, that the act of 1792 imposed the duty on the court *eo nomine,* and *not personally upon the judge,* and it appears from the note to the case in Hayburn, that a majority of the judges of the Supreme Court were of the opinion that if the law of 1792 would have conferred the power on the judges, they would have held that it was given to them personally by that description; and would have performed the duty as

commissioners, subject to the revision and control of the Secretary and Congress, as provided in the law.... *But the opinions of all of the judges embrace distinctly and positively the provisions of the law now before us, and declare that, under such a law, the power was not judicial within the grant of the Constitution, and could not be exercised as such.* *Ferreira,* 54 U.S. (13 How.) at 50–51 (emphasis added). *But see, United States v. Todd,* 54 U.S. (13 How.) at 52–53.

Utilities Commission represented an impermissible attempt to confer legislative power upon it. In reaching its decision, the Court compared the judicial and legislative functions.

> What is the nature of the power thus conferred on the District Supreme Court? Is it judicial or is it legislative? Is the court to pass solely on questions of law, and look to the facts only to decide what are the questions of law really arising, or to consider whether there was any showing of facts before the Commission upon which its findings can be justified? Or has it the power, in this equitable proceeding to review the exercise of discretion by the Commission and itself raise or lower valuations, rates, or restrict or expand orders as to service? Has it the power to make the order the Commission should have made? If it has, then the court is to exercise legislative power in that it will be laying down new rules, to change present conditions and to guide future action and is not confined to definition and protection of existing rights. * * *
>
> A judicial inquiry investigates, declares and enforces liabilities as they stand on present or past facts and under the law supposed to exist. That is its purpose and end. Legislation on the other hand looks to the future and changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power. The establishment of a rate is the making of a rule for the future, and therefore is an act legislative and not judicial in kind.

261 U.S. at 440–41, 43 S.Ct. at 447–48, quoting, *Prentis v. Atlantic Coast Line Co.*, 211 U.S. 210, 226, 29 S.Ct. 67, 69, 53 L.Ed. 150; *see also Federal Radio Commission v. General Electric Co.*, 281 U.S. 464, 469, 50 S.Ct. 389, 390, 74 L.Ed. 969 (1930).

■■■ The prohibitions in *Keller* apply directly to this case. In point of fact, the delegation to the judiciary to promulgate guidelines is more clearly legislative. In

*Keller,* the delegation was couched in terms of the review of an agency decision. Here, the judicial branch is directly given the authority to legislate. A review of the Sentencing Reform Act reveals Congress intended the Commission, in formulating the guidelines, to proceed in a non-judicial manner in performing what has historically been considered a uniquely legislative function—prescribing the punishment for crime.

The Commission's work involved formulating general rules for application outside the concrete context of any case or controversy. *Imposition* of an individual sentence is clearly a judicial function, it involves interpretation of the law and its application to a specific case. In contrast, however, formulation of guidelines which *prescribe ranges of punishment of general applicability* is not a judicial function.

The purposes of the Commission are set forth in 28 U.S.C. § 991(b). They include establishing sentencing policies and practices for the federal criminal justice system, 28 U.S.C. § 991(b)(1), and developing a method for measuring the effectiveness of those policies, 28 U.S.C. § 991(b)(2). In furtherance of these purposes, the Commission was charged with promulgating and distributing to all courts of the United States and to the United States Probation System, "guidelines * * * for use of a sentencing court in determining the sentence to be imposed in a criminal case."

The guidelines were not intended to be advisory. Under 18 U.S.C. § 3553(b) and the subsequent amendment to it, Pub.L. No. 100–182, Dec. 7, 1987, all federal judges must

> impose a sentence of the kind, and within the range [set forth in the guidelines] unless [the judge] finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, that was not adequately taken into consideration by the Sentencing Commission in formulating the guidelines [and] that should result in a sentence different from that described.[13]

---

**13.** The Commission has, itself, indicated that it "does not expect departures from the guidelines

to occur with great frequency." Supplementary

Review of the process the Commission used in developing the guidelines reveals that it involved far more than interpreting existing law and applying it to an individual case. In describing the process it used, the Commission stated that it formed "advisory and working groups" to consult on a regular basis with such groups as "federal judges, United States Attorneys, Federal Public Defenders, state district attorneys, federal probation officers, private defense attorneys, academics, and researchers." Supplementary Report of the United States Sentencing Commission (Supplementary Report) at 9 (June 25, 1987). In addition, the Commission held public meetings and received informational briefings from various private and governmental agencies, established a research program to collect vast amounts of sentencing data,[14] formally solicited the views of a variety of federal agencies concerning sentencing issues and "the specific nature and number of offenses occurring within their areas of responsibility," visited prisons and alternative correctional institutions, studied various state community service programs, received 1,020 written comments from individuals and groups, and took testimony from 213 witnesses at 13 separate hearings.

Moreover, the Commission's Supplementary Report reveals the broad policy decisions that were made in formulating the guidelines. The Commission did not view its task as a mere codification of existing practice. Its report states:

The Commission did not simply copy estimates of average current sentences as revealed through analysis of the data. Rather, it used the results of analyses of current practice as a guide, departing at different points for various important reasons. The guidelines represent an approach that begins with and builds upon empirical data, but does not slavishly adhere to current sentencing practices.

Supplementary Report at 17.[15]

■ From the foregoing, it is clear that the process used by the Commission in carrying out its mandate was entirely nonjudicial in character. This is not, however, surprising. Prescription of punishment (as opposed to the imposition of that punishment) has long been understood to be a legislative—not a judicial—function. It is settled that the ultimate authority of defining federal crimes and prescribing their punishment is vested in the Congress, not the courts or the executive branch. *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95, 5 L.Ed. 37 (1820).

In *Ex Parte United States*, 242 U.S. 27, 37 S.Ct. 72, 61 L.Ed. 129 (1916), a federal district judge, over the objections of the government, suspended execution of a minimum mandatory sentence. The government thereafter sought a writ of mandamus ordering the district judge to vacate the order of suspension, arguing that the judge was without authority to refuse im-

Report of the United States Sentencing Commission 54 (June 25, 1987).

14. With respect to the collection and use of the data, the Commission stated:

The Commission sought to resolve the practical problems of developing a coherent sentencing system by taking an empirical approach that starts from existing sentences. It has analyzed and considered detailed data drawn from more than 10,000 presentence investigations, less detailed data on nearly 100,000 federal convictions during a two-year period, distinctions made in substantive criminal statutes, the United States Parole Commission's guidelines and resulting statistics, public commentary, and information from other relevant sources, in order to determine current sentencing practices, including which distinctions are significant in present practice. After examination, the Commission has ac-

cepted, modified, or rationalized the more important distinctions.
Supplementary Report at 16.

15. Among the policy decisions evident from the Supplementary Report is the Commission's determination to increase substantially sentences for white collar crimes and crimes involving violence. *See* Supplementary Report at 18–19. In addition, the Commission decided to reduce significantly the availability of probation. *See* Supplementary Report at 60–61. *But cf.* 28 U.S.C. § 994(j) ("The Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or otherwise serious offense.").

position of the punishment prescribed by Congress. The Court agreed, stating:

Indisputably under our constitutional system the right to try offenses against the criminal laws, and, upon conviction, to impose the punishment provided by the law, is judicial. * * * [But] the effect of the proposition urged upon the distribution of powers made by the Constitution will become apparent when it is observed that [it is] indisputable * * * that the authority to define and fix the punishment for crime is legislative.

*Id.* 242 U.S. at 42, 37 S.Ct. at 74.

Moreover, the policy decisions made by the Commission have been recognized as uniquely legislative. In *Rummel v. Estelle,* 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980), the Court faced a challenge to a Texas recidivist statute, in which a defendant with three prior convictions for property related offenses was sentenced to life imprisonment. The Court, in rejecting the challenge, held that, absent a violation of the Eighth Amendment, courts should leave prescription of appropriate penalties to the legislature. It stated:

Penologists themselves have been unable to agree whether sentences should be light or heavy, discretionary or determinate. This uncertainty reinforces our conviction that any "nationwide trend" toward lighter, discretionary sentences must find its source and its sustaining force in the legislature, not in the federal courts.

*Id.* at 283, 100 S.Ct. at 1144.

Also, in *Gore v. United States,* 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958), a defendant received cumulative punishment under three statutory provisions for one illegal sale of narcotics. The Court ruled the cumulative sentences did not violate the constitutional prohibition against double jeopardy. Specifically, the Court stated:

In effect, we are asked to enter the domain of penology, and more particularly that tantalizing aspect of it, the proper apportionment of punishment. Whatev-

er views may be entertained regarding severity of punishment, whether one believes in its efficacy or its futility * * * these are peculiarly questions of legislative policy.

*Id.* at 393, 78 S.Ct. at 1285 (citation omitted).[16]

In sum, the process engaged in by the Commission in formulating the guidelines does not remotely resemble the judicial function of "interpreting and applying laws in cases properly brought before the courts" and "determining actual controversies between adverse litigants." *Mellon,* 262 U.S. at 448, 43 S.Ct. at 598; *Muskrat,* 219 U.S. at 346, 31 S.Ct. at 250. The extensive hearings, elaborate fact-finding processes, and myriad policy decisions undertaken by the Commission in promulgating general rules of future applicability, *see Keller,* 261 U.S. at 440–41, 43 S.Ct. at 447–48, are clear evidence that the Commission has performed the legislative function of prescribing the punishment for crime, *Wiltberger,* 18 U.S. (5 Wheat.) at 95; *Ex Parte United States,* 242 U.S. at 42, 37 S.Ct. at 74. The conferral of this type of authority clearly violates the carefully limited role of the judicial branch of government outlined in *Hayburn* and its progeny.

**B. Congress Can Only Delegate to the Judicial Branch the Authority to Create Procedural Rules**

■ The overarching constitutional principle that non-judicial powers may not be conferred on the judicial branch has, however, been historically subject to a carefully limited exception allowing the judiciary to exercise certain delegated authority to fashion rules of practice and procedure in the federal courts. The precise parameters of the exception remain unclear, particularly as they are constrained by the separation of powers. Examination of the history and caselaw concerning judicial rulemaking reveals, however, that the guidelines cannot come within this exception and are an

---

**16.** *See also United States v. Evans,* 333 U.S. 483, 490, 68 S.Ct. 634, 638, 92 L.Ed. 823 (1957) (rejecting construction urged by government which would require court to imply a penalty not specifically delineated in a statute as usurpation of legislative function).

invalid delegation of substantive legislative power to the judiciary.

In *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 6 L.Ed. 253 (1825), Chief Justice John Marshall interpreted the Process Act of 1792. That Act provided that in suits at law the federal courts were to use the state rules in effect in 1789. The Act, however, also provided that the foregoing was

> subject ... to such alterations and additions as said courts [of the United States] respectively shall, in their discretion, deem expedient, or to such regulations as the Supreme Court of the United States shall think proper from time to time, by rule, to prescribe to any circuit or district court concerning the same.

Act of May 8, 1792, § 2, 1 Stat. 275–76.

> In reviewing the Act, the Court stated: Congress may certainly delegate to others, powers which the legislature may rightfully exercise itself. * * * The courts, for example, may make rules, directing the returning of writs and process, the filing of declarations and other pleadings and other things of the same description. It will not be contended that these things might not be done by the legislature, without the intervention of the courts; yet it is not alleged that the power may not be conferred on the judicial department.

*Wayman v. Southard*, 23 U.S. (10 Wheat.) at 43.

Similarly, in *Sibbach v. Wilson & Co.*, 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1940), the Court reaffirmed the power of Congress to delegate limited rulemaking authority to the judiciary.

> Congress has undoubted power to regulate the practice and procedure of federal courts, and may exercise that power by delegating to this or other federal courts authority to make rules not inconsistent with the statutes or Constitution of the United States.

312 U.S. at 9–10, 61 S.Ct. at 424.

In 1934, after an intervening period during which Congress withdrew much of the rulemaking authority it had previously delegated to the judiciary,[17] the Rules Enabling Act was enacted. The Act, which has survived to this day in substantially the same form, reads in relevant part:

> The Supreme Court shall have the power to prescribe by general rules, the forms of process, writs, pleadings, and motions, and the practice and procedure of the district courts and courts of appeals of the United States in civil actions....
>
> Such rules shall not abridge, enlarge, or modify any substantive right.

28 U.S.C. § 2072.

A review of the long history leading to the passage of the Rules Enabling Act reveals that its procedure/substance distinction—drawing the line between the judiciary's delegated function as rulemaker and any rulemaking authority retained by Congress—was drawn to serve a number of purposes. *See* Burbank, *The Rules Enabling Act of 1934*, 130 U.Pa.L.Rev. 1015, 1106 (1982) (hereinafter "Burbank").

Among these purposes was clearly confinement of the delegation of rulemaking authority within the constitutional limits imposed by the separation of powers. In this regard, a 1926 Senate Committee Report, responding to the criticism that the Act would authorize changes in the substantive rights of litigants in the guise of procedural rules, states:

> Where a doubt exists as to the power of a court to make a rule, the doubt will surely be resolved by construing a statu-

---

**17.** The Conformity Act of June 1, 1872, 17 Stat. 196, withdrew from the courts, in actions at law, the discretion to alter the state law rules applicable in federal courts and adopted the principle of "dynamic conformity" (the idea that, with exceptions, federal courts should follow the procedure in use in the courts of the state in which they are located). The Act stated: [t]he practice, pleadings, and forms and modes of proceeding, in other than equity and admiralty causes in the circuit and district courts of the United States shall conform, as near as may be, to the practice, pleadings, and forms and modes of proceeding existing at the time in like causes in the courts of record of the State within which such circuit or district courts are held, any rule of court to the contrary notwithstanding.

tory provision in such a way that it will not have the effect of an attempt to delegate to the courts what is in reality a legislative function. And it is inconceivable that any court will hold that rules which deprive a man of his liberty ... are merely filling "up the details," even though they relate to remedial rights. S.Rep. No. 1174, 69th Cong., 1st Sess. 11 (1926).

While Congress' interpretation of the limits of the rulemaking authority it could properly delegate to the judiciary is not binding on this Court, it is instructive because Congress, in its deliberations, grappled with the same issues as are now before the Court.[18]

Subsequent cases decided by the Supreme Court involving challenges to court created procedural rules based on the substance/procedure distinction have been based primarily on concepts of federalism, not the separation of powers. Nevertheless, they are instructive.

In *Sibbach v. Wilson & Co.*, the Court considered a challenge to Federal Rules of Civil Procedure 35 and 37. The Court noted that the issue before it was limited to the question whether the challenged rules were procedural *as that term was used in the Rules Enabling Act.*[19]

Instructive for our purposes, however, is the Court's recognition that the boundary

---

**18.** The 1924 testimony of Justices Sutherland and McReynolds before the Senate Judiciary Committee is also instructive. In response to an inquiry by Senator Cummins (a principal author of the bill) as to the proper construction of the term "practice and procedure," the Justices stated:

> Mr. Justice Sutherland: Well, I don't know that I can give any precise definition. They apply, of course, wholly to the adjective law. *They could not involve the making of any substantive law, because the Congress would be powerless to delegate such power to the courts. I should say it would be confined to making rules pointing out the way in which cases should be presented,* and the way in which the court should discharge its duty in determining what the substantive law is. I don't know that I could state it any more accurately than that.
>
> Mr. Justice McReynolds: A method of determining and enforcing rights and liabilities which have been prescribed by law.

Hearing on S. 2060 and S. 2061 Before a Subcommittee of the Senate Judiciary Committee, 68th Cong., 1st Sess. (1924), (quoted in, Burbank, at 1078).

In addition, a letter from Senator Cummins to then Chief Justice Taft stated:

> I have attempted to put in the fewest possible words, the bill intended to accomplish simplification and uniformity in the pleadings, practice, and procedure in actions at law. I am sending a copy to you for your consideration and comment. I hope you will particularly note the sentence reading:
>
> "Said rules shall neither abridge, enlarge, nor modify the substantive rights of any litigant."
>
> I hope you will not think that I overlooked the obvious principle that Congress could not if it wanted to, confer upon the Supreme Court, legislative power. I have suggested this sentence solely to quiet the apprehensions

of those who may be opposed to any measure of this sort.

Letter from the Hon. Albert B. Cummins to the Hon. William H. Taft (December 17, 1923) (William Howard Taft Papers, Library of Congress, Washington, D.C., reel 259), reprinted in Burbank, *supra.*

Finally, an influential article appearing in the Harvard Law Review at the time the Act was under consideration stated:

> The legislature cannot, to be sure, constitutionally give power to the courts to make laws covering substantive rights. The making of such laws is a legislative and not a judicial function. The courts may not make substantive law except in so far as the decision of an actual controversy serves as a precedent for the determination of subsequent controversies, if, indeed, this process can be called making and not merely pronouncing or discovering law. In the Senate bill, it is expressly provided that the rules of the Supreme Court shall not affect the substantive rights of any litigant.

Scott, 38 Harv.L.Rev. 1, 3–4 (1924) (quoted in Burbank at 1080).

**19.** It stated:

> The contention of the petitioner, in the final analysis, is that Rules 35 and 37 are not within the mandate of Congress to this Court. This is the limit of permissible debate, since argument touching the broader questions of Congressional power and of the obligation of federal courts to apply the substantive law of a state is foreclosed.

*Sibbach*, 312 U.S. at 9, 61 S.Ct. at 424.

Based on this limitation, the Court recognized that the procedure/substance distinction in the Act raised federalism concerns because a finding that a rule was substantive and therefore not within the authority delegated by the Act required application of applicable state law under the Rules of Decision Act. *See id.* at 10–11, 61 S.Ct. at 424–425.

on the rulemaking authority of the judiciary drawn by the Rules Enabling Act is not necessarily the only limitation applicable to the delegation of legislative power in the area. In fact, the Court's opinion even suggests that the boundaries delineated in the Act may not be coterminous with those imposed upon the judiciary by reason of the separation of powers.[20]

The Commission would have this Court imply from the Supreme Court's preoccupation with federalism that the procedure/substance distinction drawn in the Rules Enabling Act was intended solely to allocate lawmaking power between the federal government and the states. It contends that the procedure/substance distinction has no significance in determining the limits of the authority Congress may confer upon the judicial branch in the guise of procedural rulemaking. Such a position is untenable.

If the general principle that non-judicial power may not be conferred on the judicial branch remains vital, *see* supra at 1318–1321, the delegation of judicial rulemaking authority recognized in *Wayman* and its progeny must be limited to procedural rulemaking.[21]

### C. The Guidelines Are Substantive

 Comparing the limited authority that may be delegated to the judiciary to promulgate rules regulating its practice and procedure and the nature of the broad delegation to the judicial branch to promulgate the guidelines, it is apparent that the guidelines are an invalid exercise of substantive legislative authority.

The procedure/substance distinction is a slippery concept that is applied in a conclusory manner in very different legal contexts. *See Guaranty Trust Company of New York v. York,* 326 U.S. 99, 108, 65 S.Ct. 1464, 1469, 89 L.Ed. 2079 (1945). Recognizing as much, the Commission argues that the guidelines fall within the limited exception recognized in *Wayman* and its progeny because they are in aid of the function of the judicial branch and are directed to judges and not to the public. In this regard, it is contended that the guidelines are similar to the federal procedural rules upheld in *Hanna v. Plumer,* 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965), the Federal Rules of Criminal Procedure, the Federal Rules of Appellate Procedure, the Federal Rules of Evidence, and the disciplinary and court management authority of the Judicial Council of the Tenth Circuit upheld in *Chandler v. Judicial Council,* 398 U.S. 74, 90 S.Ct. 1648, 26 L.Ed.2d 100 (1970).

The nature of the guidelines, however, demonstrate the sophistry of this attempt-

---

20. It stated:
 There are other limitations upon the authority to prescribe rules *which might have been,* but were not mentioned in the Act; for instance, the inability of a court, by rule, to extend or restrict the jurisdiction conferred by statute. *Sibbach,* 312 U.S. at 10, 61 S.Ct. at 425.

21. It has been argued that the two lines of cases represented by *Hayburn's Case* and *Wayman* are more appropriately harmonized by construing the authority to make procedural rules as shared by the Courts and Congress. Under this view, congressional power to establish rules of judicial procedure derives from Article I, section 8, clause 9, of the Constitution which grants it the authority to "constitute Tribunals inferior to the Supreme Court." Similarly, the power of the judiciary to establish such rules is inferred from Article III, section 1, which states that "The judicial power of the United States, shall be vested in one Supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." *See* Note, The Proposed Federal Rules of Evidence: Of Privi-

leges and the Division of Rulemaking Power, 76 Mich.L.Rev. 1177, 1181–84 (1978).
Although the validity of this theory is questionable in light of the pronouncements in *Wayman,* 23 U.S. (10 Wheat.) at 43 ("Congress may certainly delegate to others, powers which the legislature may rightfully exercise itself. * * * It will not be contended that these things might not be done by the legislature, without the intervention of the courts; yet it is not alleged that the power may not be conferred on the judicial department."), and *Sibbach,* 312 U.S. at 9–10, 61 S.Ct. at 424 ("Congress had undoubted power to regulate the practice and procedure of federal courts and may exercise that power by delegating to this or other federal courts authority to make rules not inconsistent with the statutes or Constitution of the United States."), it need not be addressed because whatever inherent rulemaking power the judiciary may have, it would be limited to the same degree by the *Hayburn's Case* line of authority.

ed characterization. In fact, the statutory framework designed by Congress which requires judges to impose a sentence within the limits prescribed by the Commission reveals that the term "guidelines" is a gross misnomer. The work of the Commission, properly characterized, is nothing less than the delegated performance of the historically legislative task of prescribing the punishment for crime.

The trial of an offense against the criminal laws and imposition of a sentence within the range fixed by the legislature represents the limit of the judicial function.[22] *See Ex Parte United States,* 242 U.S. at 41, 37 S.Ct. at 74. Although the guidelines will reduce the judges' historical contribution in determining the sentence by prescribing a narrower range within which a sentence may be lawfully imposed, they do not in any way aid the judge in imposing a sentence within that range. Accordingly, to state that the guidelines aid the judical function is both to mischaracterize that function and the nature of the guidelines.

The right to be free from the physical coercion and control embodied in a prison sentence is one of the most important rights enjoyed by citizens of a free nation. If this Court were to uphold judicial action extinguishing those rights in the guise of procedural rule-making, historical limitations on the power of courts become meaningless.

It is difficult to imagine a more substantive exercise of authority than that delegated to the Commission—prescribing the punishment for crime.

Review of the caselaw confirms the obvious. In *Miller v. Florida,* 482 U.S. ——, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987), the Supreme Court upheld a challenge to the application of sentencing guidelines promulgated in the State of Florida which increased the range of the defendant's presumptive prison sentence from 3½–4½ years to 5½–7 years on the ground that they violated the Ex Post Facto Clause.

In establishing a principle directly applicable to this case, the Court refused to characterize Florida's guidelines scheme as a procedural device intended to " 'merely guide and channel' the sentencing judge's discretion." In so doing, the Court distinguished the federal parole guidelines, which it had earlier found to be procedural.

First, because the Parole Commission, like the courts, exercises wide discretion in determining release dates within the range of punishment prescribed by Congress, its guidelines have been found not to be "laws" for purposes of the Ex Post Facto Clause. *Id.* 482 U.S. at ——, 107 S.Ct. at 2453, 96 L.Ed.2d at 363. In contrast, the requirement of "clear and convincing" reasons for departure from the Florida guidelines indicated that they were more than "flexible 'guideposts' for use in the exer-

---

**22.** It can be argued that in promulgating the guidelines the Sentencing Commission has engaged in both of the legislative prerogatives—defining crime and fixing punishment. While the latter is clear, the former is more subtle.

Examination of the guidelines reveals that in all but the simplest of cases the sentence prescribed must be increased by a specific amount to reflect various enumerated "aggravating" factors. Such factors may not be represented in the elements of the offense for which the offender has been convicted or to which the offender has plead guilty. Nonetheless, they will inevitably and measurably increase the prescribed range within which the judge may properly impose sentence. The question, therefore, arises whether such "aggravating" factors are in fact, despite the characterization of the Commission, elements of the offense which must be charged and proven or admitted. The answer to the question is of critical importance to the application of the guidelines and—if informal

studies of this Court showing that uncharged conduct will routinely account for more than 50% of the sentence are correct—is certain to be litigated. *Cf. McMillan v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986), in which the Supreme Court rejected a due process challenge to a Pennsylvania statute requiring a mandatory minimum prison sentence of five years if the sentencing judge finds, by a preponderance of the evidence, that the offender "visibly possessed a firearm" during the commission of a felony. Writing for the majority, Justice Rehnquist found that visible possession was not required to be treated as a substantive element. He stated the following as one of the reasons for the Court's holding:

> The statute gives no impression of having been tailored to permit the visible possession finding to be a tail which wags the dog of the substantive offense.

482 U.S. at ——, 107 S.Ct. at 2418, 91 L.Ed.2d at 77.

cise of discretion."[23] Second, the parole guidelines, unlike the Florida guidelines, were not passed by the legislative branch and do not have the force and effect of law. *Id.* Finally, the parole guidelines left unaffected "the crime for which [a] ... defendant [is] indicted, the punishment prescribed therefor, and the quantity or the degree of proof necessary to establish his guilt." *Id.* (citing *Dobbert v. Florida,* 432 U.S. 282, 294, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344), whereas the Florida guidelines "directly and adversely affect[ed] the sentence petitioner receives."

Applying these factors to the federal guidelines, one can only conclude that they are substantive. First, unlike the Parole Commission's application of its guidelines, judges may not depart from the federal guidelines in their complete discretion. Rather, the Sentencing Reform Act imposes clear standards strictly limiting departures, and a failure to follow them is reviewable on appeal. *See* 18 U.S.C. § 3553(b) (as amended by Pub.L. No. 100–182, Dec. 7, 1987) (setting forth standards for departure). *Compare* 18 U.S.C. § 3742 (providing for appellate review of sentences) *with* 18 U.S.C. § 4218(d) (committing Parole Commission's decision to grant, deny, modify, or revoke parole to its discretion).

Second, like the Florida guidelines, the federal guidelines were subject to legislative review and have the force and effect of law. *See* Pub.L. No. 98–473,

§ 235(a)(1)(B)(ii)(III) (providing Congress with six months to review the guidelines submitted to it by the Commission before they became effective).

Finally, the guidelines will directly affect the sentence imposed. As this Court has pointed out, *see* supra at 1323, the Commission did not merely duplicate present sentencing practices. Rather, it chose to engage in the legislative function of increasing existing penalties where it felt they were warranted.[24]

In addition to the foregoing, another strong indication of the substantive nature of the guidelines is the broad impairment of the function of the judiciary resulting from involvement of the judges on the Commission. *See infra* at 1329–1339.

In sum, because the guidelines do not fall within the limited area in which Congress may validly confer authority to promulgate rules regulating the practice and procedure upon the judiciary, Congress' attempted delegation to the judiciary cannot stand.

## VI. THE DELEGATION OF SUBSTANTIAL LEGISLATIVE AUTHORITY TO ARTICLE III JUDGES SO SUBSTANTIALLY IMPAIRS THEIR FUNCTION AS TO BE VIOLATIVE OF THE SEPARATION OF POWERS

The Justice Department contends that, notwithstanding specific language in the

---

**23.** The Court noted that, under Florida law, "[t]he 'clear and convincing' standard was construed as requiring reasons of such weight as to produce in the mind of the judge a firm belief or conviction, without hesitancy, that departure is warranted."

**24.** While it is arguable that, because *Miller* involves an Ex Post Facto challenge, the primary factor considered by the Court was whether the defendant's sentence would increase as a result of application of the Florida guidelines. This ignores, however, the Court's recognition that, in order to violate the Ex Post Facto Clause, the guidelines revision at issue not only had to result in an increased sentence but also had to be substantive. In this light, the case is properly understood as addressing the question whether the Florida guidelines were procedural, since, if they were, the change in them would also

have been a change in procedure and therefore not a violation of the Ex Post Facto Clause.

Accordingly, *Miller* strongly implies that, although not violative of the Ex Post Facto Clause unless they would increase sentences, mandatory guidelines are substantive, regardless of their effect on sentences. In any event, the Supplementary Report of the Commission indicates that it expects the guidelines to result in harsher sentences. The report states:

> The projections of our basic model indicate that the guidelines will have two interrelated effects on sentences. First, they will reduce the number of straight probation terms. A larger proportion of offenders will be required to serve some time in some form of confinement. Second, the guidelines will, for a number of crimes, increase somewhat the average length of time served.

Supplementary Report at 60.

Act placing the Commission in the judicial branch, this Court should uphold the guidelines by characterizing the Commission as part of the executive branch. In doing so, it recognizes the constitutional infirmities attendant on placement of the Commission in the judicial branch.[25] However, because the task of formulating the guidelines substantially impairs the function of the judiciary in whatever branch the Commission is placed, the Justice Department's arguments are unavailing.

The contention that the Commission is valid as an executive or independent agency assumes that judges may perform non-judicial functions in an individual capacity, even though similar functions could not be conferred on them as members of the judicial branch. This assumption is erroneous.

The caselaw does not support the proposition that judges can temporarily or selectively abandon their judicial role to serve in the other branches of government in an individual capacity.

In *Hayburn's Case*, 2 U.S. (2 Dall.) 408, an Act conferred jurisdiction on *all the circuit courts of the United States (and in jurisdictions without circuit courts, the district courts)* to adjudicate the claims of pensioners, subject to the review of the Secretary of War and Congress.

While all of the justices of the Supreme Court sitting as circuit judges decided the task was non-judicial and could not be performed by "judges-as-judges," *see* supra at 1319–1320, they were divided on the subsidiary question of whether these claims could

be decided by the judges sitting in a "non-judicial" capacity as "commissioners."

The circuit court for New York, upon which Chief Justice Jay and Justice Cushing sat, decided they could properly adjudicate these claims as commissioners and began to do so. The circuit court for Pennsylvania refused to exercise the power in any respect. The circuit court of North Carolina held the question under advisement. Before any of the circuit court determinations could be tested in the Supreme Court, however, Congress repealed the statute in question. Thus, the issue in *Hayburn's Case*, of whether the judges could sit as "commissioners," was mooted.

However, this specific issue was later resolved by the case of *United States v. Todd*, (U.S., February 17, 1794) (summarized in a note written by Chief Justice Taney as an addendum to *United States v. Ferreira*, 54 U.S. (13 How.) 40, 14 L.Ed. 42). *See generally United States v. Yale Todd*, 15 Wash. & Lee L.Rev. 220.

As previously noted, Justices Jay and Cushing, before the act was repealed, began to process pension claims in their individual capacities as commissioners. Their actions in this capacity were challenged by the United States some two years later. The parties stipulated to the fact that Todd, a revolutionary war veteran, was deserving of the court's award of benefits. Thus, before the court was the question of whether the Article III judges could hear such claims in a non-judicial capacity as commissioners. The Supreme Court decided unanimously that they could not. Ac-

---

**25.** In its brief, the Justice Department states: This case would * * * be straightforward, except for one short phrase in the Act. Congress designated the Commission as being in the judicial branch. 28 U.S.C. § 991(a). If the congressional designation is correct, then two potential constitutional problems with the Commission's composition can be urged: that Congress has assigned an executive function—rulemaking—to a judicial entity in violation of Article III; and that Congress has created a judicial entity whose members are removable by the President in violation of separation of powers principles set forth in *Bosher [Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986)].

* * * *

* * * [I]t is the position of the Department of Justice that attempting to salvage the judicial designation for the Commission creates constitutional issues which do not exist if the designation is held to be erroneous. Put another way, these problems completely disappear if one looks at what Congress did, not what it said it did. Congress assigned to the Commission the executive function of promulgating general, prospective, and binding guidelines pursuant to a legislative delegation. Government's Response Memorandum in Opposition to Defendant's Motion to Preclude Application of the Sentencing Guidelines at 9–11.

cording to Chief Justice Taney, implicit in this decision was the holding:

> That as the act of Congress intended to confer the power on the courts as a judicial function, *it could not be construed as an authority to the judges composing the courts to exercise the power out of court in the character of commissioners.*

Chief Justice Taney's Account of *United States v. Todd,* 54 U.S. (13 How.) at 53. (emphasis added).

Accordingly, any suggestion that *Hayburn's Case* supports the proposition that judges can perform non-judicial functions in an individual capacity is nullified by the holding of *United States v. Todd.*

The government and the Commission cite *United States v. Ferreira* for the proposition that judges can perform non-judicial governmental functions in an individual capacity. However, as noted, the question before the Court in that case was the narrow one of whether an appeal lay to the Supreme Court from the decision of a federal judge acting in an executive capacity. Accordingly, all the case stands for is the proposition that such an appeal did not lie because the act at issue was non-judicial. The specific question of whether a federal judge could perform this non-judicial function in an individual capacity and whether his determinations were valid was never specifically before the Court.

In the end, it is clear that neither *Hayburn's Case, Todd,* nor *Ferreira* provide any support for the proposition that powers which would be improperly conferred on judges-as-judges can be given to judges in an individual capacity.

The notion that a non-judicial power cannot be given to a judge-as-judge logically prohibits the assumption of the power by judge-as-individual. The separation of powers was meant to ensure that different people would staff the three branches of government in order to protect against the concentration of power in the same hands. This danger is present, whether a judge performs the non-judicial duty as an individual or as a member of the judicial branch.

### A. Impairment of Function

■ Even assuming the propriety of judges performing some limited non-judicial functions in their individual capacities, service of judges on the Sentencing Commission is impermissible because it would substantially impair the function of the judiciary.

While the branches of government are not intended to be hermetically sealed and may exercise significantly overlapping powers, one branch of government may not act so as to impair the function of another branch. *Nixon v. Administrator of General Services,* 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1977). In assessing impairment of function, the threshold question is whether action by one branch has the *potential* to "prevent[ ] the [affected branch] from further accomplishing its constitutionally assigned functions." *Id.* If so, the Court must further inquire "whether that impact is justified by an overriding need to promote objectives within the constitutional authority" of the branch that is acting. *Id.*

In order to assess the potential impairment of the function of the judiciary caused by service of judges on the Commission, one must first define that function. In this regard, the Supreme Court has characterized the judicial function as "the duty of interpreting and applying [laws] in cases properly brought before the courts," *Massachusetts v. Mellon,* 262 U.S. at 488, 43 S.Ct. at 601, and as "the right to determine actual controversies arising between adverse litigants, duly instituted in courts of proper jurisdiction." *Muskrat v. United States,* 219 U.S. at 361, 31 S.Ct. at 255.

Accordingly, the judicial function has two distinct elements: consideration of what the law means and application of the law to cases and controversies. "Consideration" of laws involves not only interpreting the relevant constitutional, statutory, and common law, but also determining whether legislation and its execution are consistent with the constitution. *See Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1801). "Application" of the re-

sulting law involves "pronoun[cing] a judgment and carry[ing] it into effect." *Muskrat v. United States*, 219 U.S. at 356, 31 S.Ct. at 253.

Impartiality lies at the very core of these functions and thus must be preserved if the judicial branch is to remain unimpaired. Service of judges on the Sentencing Commission seriously threatens the impartiality of the judicial branch because it could impermissibly bias, not only a judge who served on the Commission, but also other federal judges.

In a number of recent cases, Courts of Appeals have examined the potential for impairment of the function of the judicial branch by participation of judges in non-judicial governmental activities. In *In re Sealed Case*, 838 F.2d 476 (D.C.Cir.1988), the Court of Appeals for the District of Columbia examined a provision in the Ethics in Government Act of 1978, 28 U.S.C. § 49, 592–98, authorizing a "Special Court," consisting of three federal judges to appoint and supervise an independent counsel to investigate the actions of various government officials. The Court found the provision was violative of the separation of powers. One of the infirmities the Court noted was the loss of independence and impartiality to the entire judiciary resulting from the involvement of the three federal judges. The Court stated:

> Intimate involvement of an Article III court in the supervision and control of a prosecutorial office undermines the status of the judiciary as a neutral forum for the resolution of disputes between citizens and their government. From the inception of this nation the crucial importance of a neutral judiciary has been repeatedly emphasized.... [The] careful delineation of the Judicial Branch's appropriate role serves both to guard against the danger of judicial tyranny ... and to preserve the courts as a neutral forum for the resolution of disputes. "Judicial adherence to the doctrine of the separation of powers preserves the courts for the decision of issues, between

litigants, capable of effective determination."

*Id.* 838 F.2d at 516, citing *United Public Workers of America v. Mitchell*, 330 U.S. 75, 90, 67 S.Ct. 556, 565, 91 L.Ed. 754 (1947).

Thus, in *In re Sealed Case*, the Court found that the non-judicial service of just three federal judges impaired the function of the entire "judiciary." In this case, service by three federal judges on the Sentencing Commission even more severely undermines the status of the judiciary and involves them even more intimately with the executive branch.

First, unlike the Special Court, the judges on the Sentencing Commission are in continuous contact with the members of the executive branch as they participate in the setting of policy. Moreover, they sit on a policy-making body where they comprise the minority of voting members. Thus, they are subject to the clear constant influence of the executive branch in their decision-making process. Perhaps most ironically, in their capacity as members of an executive agency, the judges are charged with training other members of the judiciary in the use of the guidelines. 28 U.S. C. § 995(a). Thus, as members of the executive branch, the judges are performing a judicial function by interpreting the law for other judges. In this sense, the judges threaten the separation of powers in a second light.

Service on the Sentencing Commission subjects the judicial participants *both* to the carrot of advancement and to the stick of removal. In terms of advancement, the President is given authority with the advice and consent of the Senate to appoint judges to the Commission.[26] It is clear that judges may come to view service on a commission as a source of prestige and method of advancement. In this light, whether judges are actually swayed by the prospect of an executive appointment, there is a real danger that the public will come to view the judge's actions as motivated by a desire to please the President. *See generally*

---

**26.** Although the Judicial Conference is to recommend six judges, the Act only requires the President to "consider" the recommendations. 28 U.S.C. § 991(a).

Comment, *The Separation of Powers and Service on Presidential Commissions,* 54 U.Chi.L.Rev. 993, 1011–1020 (1986) (hereinafter "Separation of Powers").

Second, the executive also wields the stick of removal. The President may remove the judges for any number of reasons, including "for good cause shown." 28 U.S.C. § 991(a). In this power lies the potential for executive influence over the judge's substantive decision-making. *Cf. Bowsher v. Synar,* 478 U.S. 714 at ——, 106 S.Ct. at 3189, 92 L.Ed.2d at 597 (finding Comptroller General subject to the influence of the legislative branch because he could be removed by it for permanent disability, inefficiency, neglect of duty, malfeasance or commission of a felony or conduct involving moral turpitude.)

In short, given the foregoing, it is clear that the impartiality of the members of the Sentencing Commission is more likely to be threatened than the members of the Special Court in *Sealed Case.*

Closer to the issue presented here is the recent case of *In re Application of the President's Commission on Organized Crime Subpoena of Scaduto,* 763 F.2d 1191 (11th Cir.1985). In this case, the Eleventh Circuit faced a separation of powers challenge to a presidential commission based on the participation of federal judges on the commission.

In *Scaduto,* two Article III judges served on a commission "composed of not more than twenty members appointed or designated by the President." *See* Executive Order No. 12435, 3 C.F.R. § 202 (1983). There was no requirement or suggestion that members of the judiciary sit on the Commission.

The Commission was to make a thorough study of organized crime in the United States and, based on its results, "advise the President and the Attorney General with respect to actions which can be undertaken to improve law enforcement efforts direct-

ed at organized crime, and make recommendations concerning appropriate administrative and legislative improvements in the administration of justice." To enable the Commission to carry out its assignments, Congress authorized the Commission to hold hearings and to issue subpoenas, *see* Pub.L. No. 98–368, 98 Stat. 490 (1984).

A prisoner moved to quash a subpoena issued by the Commission and a writ of habeas corpus ad testificandum issued by a federal district judge to compel his testimony before the Commission, in part, on the ground that participation of federal judges on the Commission violated the separation of powers.

The Court, relying on *Hobson v. Hansen,* 265 F.Supp. 902 (D.D.C.1967) (three judge court), stressed that, in addition to identifying categorical prohibitions based on the "case and controversy" requirement, federal judges are constrained in their extra-judicial activities by "the limitations of propriety," by the requirements that their non-judicial duties do not have "such incongruity" with the judicial function as would void the judicial power which had been conferred, and by the "guarantees of personal liberty" which are conferred upon citizens and potential litigants, *Hobson,* 265 F.Supp. at 915. These limitations the Court found from Article III and the Fifth and Fourteenth Amendments to the Constitution.

The Court found the judges' impartiality, was threatened by several of the activities of the Commission. Specifically, it believed that a judge charged with assisting and improving enforcement efforts against organized crime might adopt a pro-government perspective ill-suited to his obligation of neutrality in the courtroom. Moreover, it considered the type of information uncovered through the investigatory activities of the Commission likely to further endanger the judges' impartiality.[27] Finally, the

---

27. If the data and testimony surveyed by the Commission were to demonstrate, for example, that the magnitude of the threat posed by organized crime was greater than had been previously been suspected, that a substantial amount of organized crime activity was never prosecuted, or that law enforcement officials in many parts of the country employed methods that were poorly chosen, subject to abuse or inadequate to combat with the problem,

Court concluded that, even if the judge was satisfied that he could separate his participation on the Commission from his judicial functions, it is not clear that litigants would also be satisfied.

The type of prejudice found to violate the separation of powers in *Scaduto* is present in this case to an even greater degree. The *Scaduto* court saw sufficient risk of prejudice in dealing with organized crime. Yet, the issue of sentencing is far more broadly applicable and involves issues of a more substantive nature. Moreover, in *Scaduto*, the Commission only recommended legislation. Here, the Commission actually enacted it. One is far more involved and likely to be prejudiced by formulation of specific legislation than by a simple recommendation which may or may not be reflected in a final enactment.

The participation of the judges on the Sentencing Commission, *which promulgated actual law*, also raises a host of impartiality concerns not present in *Scaduto*.

The guidelines created by the Commission are both comprehensive and complex. Legal challenges to them will be numerous and varied. Some of the challenges will involve constitutional issues such as those raised herein, others will involve questions as to the process due a defendant in the application of the guidelines, while still others will involve questions as to the proper interpretation of the guidelines.

While the Court does not wish to minimize the constitutional issues at stake, it is clear that the far greater threat to the impartiality of the judiciary is posed by the latter two types of challenges. It is inevitable that in formulating the guidelines, the Commission was concerned not only with their content, but also with the manner in which they would be applied to individual cases. Therefore, in structuring the procedure to be followed under the guidelines, the Commission has inescapably ventured an opinion on extraordinarily important procedural issues, many of which are of a constitutional dimension.[28] It is inconceivable that, having placed their imprimatur on the prescribed process, the judges on the Commission will be able to review it impartially.

In addition, application of the guidelines will involve a vast array of interpretative issues. The issues will involve the com-

---

such discoveries could affect the way a judge approached those organized crime suspects and law enforcement officials in cases who appeared before him.
763 F.2d at 1197.

**28.** For example, if an offender is convicted of an offense involving fraud or deceit, the judge must incrase the sentence imposed by a specific amount for certain factors enumrated in the guidelines. Such factors include the amount of money involved in the offense, the amount of planning required, and the number of victims, to name just a few. These factors expose the offender to an increase in the sentence from a term of probation to a term of imprisonment for more than three years. Therefore, the procedure used to determine whether and to what degree any factor is present is crucial. With respect to that procedure, the guidelines state:

When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor. In resolving any reasonable dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.

The court shall resolve disputed sentencing factors in accordance with Rule 32(a)(1), Fed. R.Crim.P. (effective Nov. 1, 1987), notify the parties of its tentative findings and provide a reasonable opportunity for the submission of oral or written objections before the imposition of sentence.
Sentencing Guidelines at § 6A1.3.

The fact of the matter is that, because the guidelines represent a whole new approach to sentencing, questions concerning the process due a defendant and the evidence admissible at sentencing will remain open until they are properly decided by the courts. *But see* Report of the Probation Committee of the Judicial Conference, Recommended Procedures for Guidelines Sentencing and Commentary at 24 (August, 1987) (taking the position that government has the burden of establishing factors enhancing the sentence by a preponderance of the evidence and that the defendant has the burden of proving factors that mitigate the sentence by the same standard); *see also* supra n. 22 (questioning whether factors enhancing the sentence are elements of the offense required to be proved beyond a reasonable doubt).

plex, such as the appropriate method for computing sentences on multiple counts, and the simple, such as determining whether a broken leg qualifies as ordinary, serious, or permanent and life threatening bodily harm. *See* Guidelines § 2B3.1(b)(3). It is unlikely that the judges on the Commission could have participated in creating the guidelines without coming to some opinion as to the proper meaning of the terms in them. Impartiality, however, requires that judges come into the courtroom without baggage acquired in creating the law they are to apply. In other words, resorting to legislative intent should not be an exercise in personal recall.

■ That the judges who participated on the Commission may disqualify themselves from cases in which issues involving the guidelines may be raised will be of little help in limiting the impairment of the func-

tion of the judiciary. Given the prevalence of guidelines issues, the participating judges could be at risk of disqualification in nearly every criminal case.[29]

In addition, disqualification will do nothing to alleviate the effect on the judiciary as a whole. First, given the interest in staffing important commissions with knowledgeable and highly respected judges, commission appointees are likely to be those with the greatest potential to influence other judges. This subtle influence may be even more harmful; however, because it will rarely be sufficiently strong or apparent to require disqualification.[30]

Thus, it is clear that participation of judges on the Sentencing Commission creates a far greater likelihood of partiality than judicial participation on the President's Commission on Organized Crime.[31]

**29.** A judge who has an interest in one of several specified personal connections with a case must disqualify himself, *see* 28 U.S.C. § 455, and if a party feels that a judge would have a personal bias or prejudice, it may have the judge disqualified by filing a "sufficient affidavit." 28 U.S.C. § 144.

**30.** In addition, judges bring to a task such as that undertaken by the Commission a great deal of experience and wisdom. Therefore, it is understandable that Congress, in formulating policy, would seek the views of judges. Yet, by their very participation, the judges will inevitably alter the course of political debate. Indeed, by participating in the formulation of the guidelines, the judges may well have supplied a legitimacy to what may have otherwise been a politically unpalatable proposition, both to the public and to other members of the judiciary. Neither the public nor the judges are well served by such interference.

**31.** We recognize that in *In re Application of the President's Commission on Organized Crime Subpoena of Scarfo,* 783 F.2d 370 (3d Cir.1986), the Third Circuit, considered a case similar to *Scaduto* and found that judicial membership on the President's Commission on Organized Crime did not violate the separation of powers.

However, in *Scarfo,* the Court inexplicably modified the *Nixon* test to require *actual* impairment of a coordinate branch's function, rather than *potential* impairment requirement outlined by the Supreme Court.

Moreover, the Court accorded precedential weight to the *Ferreira* dicta that a judge could assume non-judicial government functions in his individual capacity. Based on this misreading and its more stringent interpretation of the *Nixon* test, the Court found judicial membership

on the Commission permissible. The Court also specifically noted two important factors leading to its decision, both of which effectively distinguish it from the instant case. First, it noted that judicial membership on the President's Commission on Organized Crime was voluntary. In *Scarfo,* the Court used the term "voluntary" in an unusual sense. Specifically, by voluntary, it meant that the enabling statute or regulation did not explicitly require some sort of "judicial participation" on the commission in question. The Court apparently believed that when service was "voluntary" a violation of the doctrine of separation of powers was more difficult to establish.

Whatever weight might be ascribed to such an argument, it would appear that the Third Circuit effectively distinguished its holding from the instant case, for the Court cited the Sentencing Commission as an example of a commission on which service was not voluntary, 783 F.2d at 376, n. 3.

Second, the *Scarfo* court, applying *Nixon* more stringently than necessary, found that the duties of the Commission did not substantively invade the province of the other branches of government. The Court carefully outlined the limited responsibilities of the Commission. It was charged with investigating, submitting a report, and recommending legislation. Suggesting tasks which might violate the constitutional boundary, the Court added, "[t]he commission does not prosecute, does not indict, *does not legislate.*" Thus, because of the Sentencing Commission's substantive powers of legislation, the *Scarfo* holding is distinguishable on a second ground.

The Court concluded under the stringent *Nixon* test that the power of the Commission *caused*

■ Against this significant impairment of the function of the judiciary outlined by the foregoing must be weighed the necessity of having Article III judges serve on the Commission. While the Court can appreciate the extraordinary importance of the subject matter addressed by the Commission and the unique position of the judges to contribute to the formulation of sound policy in this area, it finds that such factors clearly do not outweigh the potential for impairment of the function of the judiciary and the loss of its independence. Accordingly, the Court finds the guidelines unconstitutional, whether the Commission is characterized as an executive or independent agency.

## VII. *SEVERABILITY*

Having found that the guidelines are unconstitutional, it is necessary to determine whether the remainder of the Sentencing Reform Act may be severed from those portions which offend the Constitution.

"[A] court should refrain from invalidating more of a statute than is necessary ... [w]henever an act of congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty ... to maintain the act in so far as it is valid." *Regan v. Time, Inc.*, 468 U.S. 641, 652, 104 S.Ct. 3262, 3269, 82 L.Ed.2d 487 (1984) (plurality opinion) (quoting *El Paso & Northeastern R.R. Co. v. Gutierrez*, 215 U.S. 87, 96, 30 S.Ct. 21, 24, 54 L.Ed. 106 (1909)). The question of severing an unconstitutional provision turns largely on legislative intent, with a presumption favoring severability. *Regan v. Time*, 468 U.S. at 653, 104 S.Ct. at 3269. The standard for determining the severability of an unconstitutional provision is well established. "Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid

part may be dropped if what is left is fully operative as a law." *Alaska Airlines, Inc. v. Brock*, —— U.S. ——, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987) (citations omitted).

■ Applying this standard, I hold that the guidelines provisions are severable from the rest of the statute and that the remainder of the Act should stand. In this way, important purposes and goals relating to sentencing reform which Congress intended to advance will remain in effect.

The Sentencing Reform Act provides for fundamental and revolutionary changes in the sentencing process. Among the changes that can be preserved by severing the guidelines provisions are:

(a) the detailed set of principles or sentencing standards which narrow the judge's discretion in imposing sentences;

(b) the requirement of "real time" sentences under which convicted defendants will be obligated to serve the full sentence imposed by the court less good time credits earned for satisfactory behavior while in prison;

(c) the requirement that judges state their reasons for imposing particular sentences, thus opening up the sentencing process to the public; and

(d) the appellate review of sentences.

We now consider the important changes in detail:

### A. Sentencing Standards.

The Act outlines the purposes of sentencing, describes in detail the kinds of sentences that may be imposed to carry out those purposes, and prescribes the factors that must be considered by the court in determining the kind of sentence to impose in a particular case. The factors which the court must consider are set forth at 18 U.S.C. § 3553(a). They include:

---

*impartiality* problems and *imposed harmful burdens on the proper functions of the judiciary* by causing the necessity of recusal of Commission members in cases where their actions would cause prejudice. Nonetheless, it declared these problems "do not rise to the stature of an obstacle impeding the court's ability to discharge their Article III obligations." *Id.* at 381.

In the end, *Scarfo* is distinguishable. It misinterprets the impairment of function test, making it more strict than the Supreme Court intended. It misapplies *United States v. Ferreira* and gives precedential weight to dicta.

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(a) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(b) to afford adequate deterrence to criminal conduct;

(c) to protect the public from further crimes of the defendant; and

(d) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available: imprisonment, probation, fines, forfeiture of property, notification of victims, and restitution. *See* 18 U.S.C. §§ 3554–3556, 3561, 3571, and 3581.

The Act goes a step further and outlines the circumstances in which various forms of punishment are appropriate.

### 1. Imprisonment.

The Act requires that a defendant found guilty of a class A or class B felony must be sentenced to a term of imprisonment. 18 U.S.C. § 3561; it establishes a classification of offenses, 18 U.S.C. § 3559; and requires a court to impose a sentence sufficient but not greater than necessary:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[,]

with a caveat that "imprisonment is not an appropriate means of promoting correction and rehabilitation" section 3582(a) (Congress being of the view that rehabilitation could only be accomplished outside the prison walls during probation).

A term of supervised release after imprisonment is permitted as part of the sentence. The maximum term and conditions of such supervised release are set forth in section 3583. The statute lists the factors to be considered in determining whether to include a term of supervised release and, if so, the length of term and the mandatory and discretionary conditions of supervised release. 18 U.S.C. § 3583(c) and (d).

### 2. Probation.

The court is authorized to impose a term of probation unless the offense is a Class A or Class B felony, the offense expressly precludes probation, or the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense. 18 U.S.C. §§ 3561–3568. The authorized terms of probation are set forth as one to five years for a felony, not more than five years for a misdemeanor, and not more than one year for an infraction. 18 U.S.C. § 3561(b). The court, in determining whether probation should be imposed, and the terms and conditions therefor, is to consider the factors set forth in section 3553(a)(1). Incident to imposing a sentence of probation, the court must make explicit conditions of probation that (1) the defendant not commit any crime during the term of probation, and (2) that for a felony, a fine, restitution or community service must be ordered by the court. 18 U.S.C. § 3563(a). The Act also permits the court, in its discretion, to impose other conditions to the extent they reasonably relate to the factors set forth in section 3553(a) and involve only such deprivations of liberty or property as are reasonably necessary. The statute lists twenty discretionary conditions available to the court. 18 U.S.C. § 3563(b).

### 3. Fines.

The Act sets forth in some detail the conditions under which fines can be imposed and sets forth the maximum authorized fines. 18 U.S.C. § 3571. Factors to be considered by a court in imposing fines are enumerated in section 3571. These include the ability of the defendant to pay the fine in view of the defendant's income, earning capacity, and financial resources;

the burden payment of the fine will impose on the defendant and his dependents; any restitution or reparation by the defendant to the victim of the offense; and any other pertinent equitable consideration. In addition, modifications, corrections and appeals of fines are provided for in the statute, 18 U.S.C. §§ 3572–3573, as are the procedures for enforcing the payment of fines. 18 U.S.C. § 3574.

4. Consecutive or Concurrent Sentences.

The Act sets forth the circumstances under which the court may impose consecutive or concurrent sentences when multiple terms of imprisonment are involved. The factors to be applied in making this determination are also those set forth in section 3553(a). 18 U.S.C. § 3584(b).

5. Restitution.

In addition to the factors set forth above, the court must consider providing restitution to any victims of the offense in accordance with sections 3663 and 3664. 18 U.S. C. § 3553(a)(7).

B. Judges Must State Their Reasons for Imposing a Sentence.

The Act requires judges, at the time of sentencing, to state in open court their reasons for imposing the particular sentence, as well as the reasons for ordering or not ordering restitution. 18 U.S.C. § 3553(c). This requirement will not only open the sentencing process to public scrutiny, but will also tend to bring a higher degree of consistency to the sentencing process.

C. "Real time" Sentences are Required.

Section 3624(a) provides that "a prisoner shall be released by the Bureau of Prisons on the date of the expiration of his term of imprisonment, less any time credited toward the service of his sentence." Thus, the Act requires judges to impose "real time" sentences under which the term of imprisonment imposed will be the actual term served, less good time credits earned.

Accordingly, because offenders will no longer be paroled after serving only a portion of the sentence imposed, the Act eliminates the Parole Commission. See Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, Title II, § 235, 98 Stat. 2031–2034 (1984). Finally, good time credits have been reduced to fifty-four days per year. 18 U.S.C. § 3624(b).

D. Appellate Review of Sentences.

Under the Act, the sentence imposed will, for the first time, be reviewable on appeal. See 18 U.S.C. § 3742(a) and (b). Although the appellate courts must still determine the extent of their jurisdiction to entertain such appeals absent the guidelines, such review could be an effective check on the unwarranted disparity and abuse of the sentencing process which the Act was designed to remedy.

In summary, it is clear that the congressional requirements outlined above can and should stand on their own. They will tend to eliminate unwarranted disparities in sentencing; they will open the sentencing process to public scrutiny; and they will justifiably fix the responsibility for sentencing on the judges who impose the sentence.

For the reasons stated herein, this Court holds that the constitutional portions of the Sentencing Reform Act are severable and the constitutional portions of the Act may stand on their own.

VIII. *CONCLUSION*

Reform of the criminal justice system and the sentencing process in particular represents an enormous and arduous process. The Court recognizes the substantial energy and resources Congress, the Sentencing Commission, and others have invested, both in formulating the Sentencing Reform Act and creating sentencing guidelines. The Court also recognizes and appreciates the important contributions of distinguished judges and the judiciary as a whole in this process. The vast practical experience of the judges in the criminal justice system and the sentencing process is irreplaceable in formulating sound sentencing policy.

The practical argument—that judicial participation is necessary to formulate guidelines—is both powerful and appeal-

ing. Nonetheless, the price paid for judicial experience and wisdom is too high; namely, violation of the delicate balance of powers in our government; and the attendant loss by the judiciary of the independence and impartiality necessary to perform its constitutional duty. Accordingly, this Court has no choice but to hold that the sentencing guidelines are unconstitutional.