**UNITED STATES of America**

v.

**Ricardo PEREZ and Charles Wayne Andrus.**

**UNITED STATES of America**

v.

**Rafael Homero CARRALES, William Franklin Saathoff, Michael Ray Stelly, and John Henry Daniels.**

Crim. Nos. A–87–CR–116(1), A–87–CR–116(2), A–88–CR–20(1), A–88–CR–20(3), A–88–CR–20(4) and A–88–CR–20(5).

United States District Court, W.D. Texas, Austin Division.

May 23, 1988.

---

Robert Nino, Houston, Tex., for defendant Rafael Homero Carrales.

Paul Van Osselaer, Shapiro, Edens & Cook, William B. Hilgers, Hilgers & Watkins, Austin, Tex., for defendant William Franklin Saathoff.

Richard W. South, Bankston, Wright & Greenhill, Austin, Tex., for defendant Michael Ray Stelly.

William A. White, William P. Allison, White & Allison, Austin, Tex., for defendant John Henry Daniels.

Gerald H. Goldstein, Robert O. Switzer, Goldstein, Goldstein & Hilley, San Antonio, Tex., for amicus curiae, Texas Criminal Defense Lawyers Ass'n.

John R. Steer, Gen. Counsel, Donald A. Purdy, Jr., Deputy Gen. Counsel, U.S. Sentencing Com'n, Washington, D.C., (Paul S. Bator, Andrew L. Frey, Kenneth S. Geller, Stephen G. Gilles, Mayer, Brown & Platt, Washington, D.C., of counsel), for amicus curiae U.S. Sentencing Com'n.

Frank Maloney, President, National Ass'n. of Criminal Defense Lawyers, Local Counsel, Austin, Tex., Benson B. Weintraub, Sonnett Sale & Kuehne, P.A., Miami,

Fla., for amicus curiae, National Ass'n. of Criminal Defense Lawyers.

## ORDER

NOWLIN, District Judge.

The Court is faced with challenges filed by six defendants to the constitutionality of the Sentencing Reform Act of 1984, and to the Sentencing Guidelines promulgated by the United States Sentencing Commission. The challenges raise a question of supreme importance to the federal criminal justice system: whether the elaborate sentencing procedures, practices, and directives created by the United States Sentencing Commission upon Congress' mandate run counter to the dictates of the United States Constitution. Upon consideration of the arguments presented by defendants, the government, and several amici curiae,[1] the Court concludes that the Sentencing Reform Act of 1984 violates both the separation of powers doctrine, and Article I, Section 7 of the United States Constitution. The Court is also of the opinion that the Sentencing Guidelines violate the due process rights of defendants.

On February 16, 1988, defendants Rafael Homero Carrales, William Franklin Saathoff, Michael Ray Stelly, and John Henry Daniels were charged in a two-count indictment with possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and with importation of marijuana in violation of 21 U.S.C. §§ 952 and 961, and 18 U.S.C. § 2. These activities allegedly occurred on or about January 20, 1988. On April 25 and 27, 1988, Carrales, Saathoff, Stelly, and Daniels each pled guilty to one count of the indictment. Since these defendants pled guilty to offenses committed after November 1, 1987, they are currently facing sentencing under the Guidelines. The only co-defendant in this case who has not yet pled guilty or faced a jury, William Allen Scannell, is currently a fugitive. Scannell's challenge to the constitutionality of the Guidelines is not addressed by this Order.

On December 1, 1987, defendants Ricardo Perez and Charles Wayne Andrus were charged in a five-count indictment with conspiring to possess with intent to distribute cocaine and marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846, and in separate counts for cocaine and for marijuana, with both possession with intent to distribute and distribution in violation of 21 U.S.C. § 841(a)(1). The indictment states that the conspiracy occurred in the month of November 1987, and continued until on or about November 20, 1987. The other offenses allegedly occurred on or about November 20, 1987. Perez and Andrus have both entered pleas of not guilty, and trial is currently scheduled for July 11, 1988. If convicted on any count, defendants will be subject to sentencing under the Guidelines.

## I. RIPENESS [2]

The government contends that the challenges raised by defendants Ricardo Perez and Charles Wayne Andrus are not ripe for adjudication because there is no guilty plea or conviction, and therefore, the defendants lack standing. The trial of these defendants, the government maintains, could result in acquittals on all five counts, and in such an instance, there would be no necessity to reach the question of the constitutionality of the Act or the Guidelines as to these defendants.

Perez and Andrus state that their challenges to the constitutionality of the Act and the Guidelines are nonetheless ripe for consideration. Defendants desire to enter into plea negotiations. In plea negotiations, the United States Attorney's Austin Office first determines the maximum exposure the defendant could receive if indicted pursuant to the facts giving rise to the

---

**1.** The Court has received amicus curiae briefs from the United States Sentencing Commission, the National Association of Criminal Defense Lawyers, and the Texas Criminal Defense Lawyers Association.

**2.** In its analysis of the ripeness issue, the Court has considered the discussions in *United States v. Ruiz–Villanueva,* 680 F.Supp. 1411, 1415 (S.D. Cal.1988); *United States v. Chambless,* 680 F.Supp. 793, 795 (E.D.La.1988); and *United States v. Arnold,* 678 F.Supp. 1463, 1465–66 (S.D. Cal.1988).

offense. The office can only offer a plea that subjects the defendant to the same amount of exposure.

Defendants also complain that the government has resisted disclosing information regarding the sentencing factors upon which it intends to rely in determining the appropriate sentence under the Guidelines. The government is of the opinion that Federal Rule of Criminal Procedure 16; the Jencks Act, 18 U.S.C. § 3500; and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), provide for pre-trial disclosure of information to defendants, and that the Guidelines should not operate to alter the existing procedures and entitlements.

Defendants' attorneys claim that under these circumstances, negotiating a plea would constitute ineffective assistance of counsel. Defendants note that the question urged is a purely legal one, and that the interests of judicial economy and of the orderly and efficient administration of this Court's docket will be served by ruling at this time.

In determining whether an issue is ripe for determination, the Court must balance the fitness of the issues for judicial decision against the hardship to the parties of withholding court consideration. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). The disagreement "must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." *Public Service Commission v. Wycoff Co.*, 344 U.S. 237, 244, 73 S.Ct. 236, 240, 97 L.Ed. 291 (1952). If the issues raised are purely legal and will not be clarified by further factual development, then a challenge may be ripe for consideration. *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 581, 105 S.Ct. 3325, 3333, 87 L.Ed.2d 409 (1985).

Public policy favors immediate judicial resolution of the constitutional claims. *Id.* at 582, 105 S.Ct. at 3333. Eight defendants before this Court have already filed constitutional challenges to the Act, the Commission, and the Guidelines; and this Court's experience is representative of that of federal trial courts throughout the nation. These courts are currently in a quandary over what procedures and directives to follow in sentencing persons convicted of crimes committed on or after November 1, 1987. The sooner that district courts can resolve the issues, the sooner the Fifth Circuit Court of Appeals and the United States Supreme Court can definitively resolve the uncertainty regarding the constitutionality of the Guidelines which is pervasive in federal district courts today.

■ The Court reaches the same conclusion that Judge Brewster did in *United States v. Ruiz–Villanueva*:

> Having examined the facts as they now exist, the court finds that defendants' challenge is ripe for adjudication. The issues before the court—purely legal issues which do not require further factual development—are presently fully fit for judicial decision. In addition, substantial hardships will befall defendants if this court refuses to hear their challenge. Most immediate will be the difficulties which defendants will face in deciding whether to accept plea offers. Without a clear understanding of likely punishments, a defendant simply cannot make an informed decision about a plea offer. Finally, there is nothing to be gained from postponing consideration of defendants' challenge.

680 F.Supp. 1411, 1415 (S.D.Cal.1988). Accordingly, the Court finds that the Motions filed by Perez and Andrus are ripe for consideration. Substantial interests of defendants and the government, as well as the Court, will be best served by the resolution of this pressing question.

## II. SENTENCING REFORM ACT AND FORMATION OF THE SENTENCING COMMISSION

Congress established the United States Sentencing Commission ("the Commission") in the Sentencing Reform Act of 1984 ("the Act"). *See* Pub.L. 98–473, Title II, 98 Stat. 1987, 2017. The Commission was created

"as an independent commission in the judicial branch of the United States." 28 U.S.C. § 991(a). It is comprised of two nonvoting members and seven voting members. The Attorney General or his designee is an *ex officio* nonvoting member of the Commission. *Id.* The Chairman of the United States Parole Commission or his designee is a temporary *ex officio* nonvoting member of the Commission. Sentencing Reform Act of 1984, Pub. Law 98–473, Title II, 98 Stat. 1987, 2033, § 235(b)(5). The voting members include at least three federal judges selected by the President from a list of six judges recommended by the Judicial Conference of the United States. 28 U.S.C. § 991(a). All members of the Commission are appointed by the President with the advice and consent of the Senate, and may be removed by the President for neglect of duty, malfeasance in office, or other good cause. *Id.*

Congress dictated that the Commission develop a new structure for sentencing procedures and practices in the federal judicial system. Congress instructed the Commission to author Sentencing Guidelines ("the Guidelines") to:

(A) assure the meeting of the purposes of sentencing as set forth in section 3553(a)(2) of title 18, United States Code;

(B) provide certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct while maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices; and

(C) reflect, to the extent practicable, advancement in knowledge of human behavior as it relates to the criminal justice process; ...

28 U.S.C. § 991(b)(1). Among these factors, Congress considered the second most important. 28 U.S.C. § 994(f). The purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2) are: reflecting the seriousness of the offense, promoting respect for the law, and providing just punishment for the offense; affording adequate deterrence to criminal conduct; protecting the public from further crimes of the defendant; and providing the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner. Congress also directed that the Guidelines reflect the "general inappropriateness of imposing a sentence to a term of imprisonment for the purpose of rehabilitating the defendant or providing the defendant with needed educational or vocational training, medical care, or other correctional treatment." 28 U.S.C. § 994(k).

Congress mandated that the Commission develop Guidelines establishing a method for categorizing both offenses and defendants, and setting sentence ranges for each combination of offense and defendant categories. 28 U.S.C. § 994(a) and (b). In regard to offense categories, Congress directed the Commission to consider the relevance, if any, of the following factors: the grade of the offense; aggravating or mitigating circumstances under which the offense was committed; the nature and degree of harm caused by the offense; the community view of the gravity of the offense; the public concern generated by the offense; the deterrent effect of sentence; and the current incidence of the offense. 28 U.S.C. § 994(c). In regard to defendant categories, Congress directed the Commission to consider the relevance, if any, of the following factors: age, education, vocational skills, mental and emotional condition; physical condition, including drug dependence; employment record; family ties and responsibilities; community ties; role in the offense; criminal history; and degree of dependence upon criminal activity for livelihood. 28 U.S.C. § 994(d). This directive is immediately followed by Congress' statement that the Commission shall assure that the Guidelines reflect the general inappropriateness of considering education, vocational skills, employment record, family ties and responsibilities, and community ties when sentencing an individ-

ual. 28 U.S.C. § 994(e). The Commission is directed to assure that the Guidelines are entirely neutral as to race, sex, national origin, creed, and socioeconomic status of offenders. 28 U.S.C. § 994(d).

Pursuant to these instructions, the members of the Commission were appointed and confirmed, and Guidelines were promulgated. The Guidelines were presented to Congress and, after six months without Congressional action, became effective as to offenses committed on or after November 1, 1987. Sentence Reform Act of 1984, Pub. Law 98–473, Title II, 98 Stat. 1987, 2031, § 235(a)(1) (as amended by the Sentencing Act of 1987, Pub. Law 100–182, § 2, 101 Stat. 1266). The Guidelines create a grid with the offense categories running along the vertical axis and the defendant categories along the horizontal axis. After the sentencing judge determines which offense and which defendant categories fit the case, he consults the sentencing table to determine the range of acceptable punishments. *See* Guidelines, ch. 5, part A, at 5.2. Calling the procedures established by the Commission "Guidelines" is a misnomer, because the sentencing judge must follow them:

> The court *shall* impose a sentence of the kind, and within the range, referred to in [the Guidelines] unless the court finds that there exists an aggravating or mitigating circumstance of a kind or to a degree not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described. In determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission.

18 U.S.C. § 3553(b) (as amended by the Sentencing Act of 1987, Pub. Law 100–182, § 3, 101 Stat. 1266) (emphasis added). Aggravating and mitigating circumstances that justify departures are discussed in chapter 5, part K of the Guidelines.

## III. SEPARATION OF POWERS

The strength and endurance of our federal governmental structure results from the foresight of the framers of the Constitution in creating a secure separation of power among and between its three branches. The framers of the Constitution assigned to each of the three distinct branches (the legislative, executive, and judicial) distinct powers and responsibilities, devising a system of checks and balances to "diffus[e] power the better to secure liberty". *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (Jackson, J., concurring). As James Madison noted:

> Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for *the judge* would then be the *legislator*. Were it joined with the executive power, *the judge* might behave with all the violence of *an oppressor*.

The Federalist No. 47, at 303 (J. Madison) (quoting Montesquieu) (Rossiter ed. 1961) (emphasis in original). Thus, the necessity of maintaining each branch free from the control or dominating influence of the other branches is of paramount legal and historical importance. *See e.g., Humphrey's Executor v. United States*, 295 U.S. 602, 630, 55 S.Ct. 869, 874, 79 L.Ed. 1611 (1935). Whether it be the judicial branch seeking to determine public policy, the executive branch conducting itself outside the parameters of legislative directive, or the legislative branch engaging itself in the direct conduct of matters constitutionally limited to the executive, the tendency of one co-equal branch to trespass upon the clear constitutional powers of another branch threatens the stability of that delicate scheme of checks and balances devised through the genius of the Framers as the foundation of a permanent federal system.

The Sentencing Reform Act of 1984 creates a Sentencing Commission within the judiciary, composed of judges and non-judges appointed by the President, and empowered to establish binding rules which substantively affect the rights of criminal defendants. The Commission offends the

separation of powers doctrine by impermissibly intertwining the responsibilities of the separate branches. Placing the Commission in the judicial branch expands the judiciary's responsibilities beyond the limitations established by Article III of the Constitution. In addition, even if the nature of the Commission's responsibilities merit construing it as a legislative or executive commission, the statutory requirement that Article III judges sit on the Commission as voting members amounts to judicial legislation and execution of the law. Furthermore, the composition and authority of the Commission, along with the Executive's control over it, raises grave questions as to the impartiality and independence of the judicial branch.

The Sentencing Reform Act violates the separation of powers doctrine by expanding the responsibilities of the judiciary beyond those set forth in Article III, Section 2 of the Constitution and is, therefore, unconstitutional on its face. A provision of the Act, codified as 28 U.S.C. § 991(a), establishes the Commission as an independent commission within the judicial branch. The Commission is charged with drafting and revising substantive and mandatory rules to be applied by judges in sentencing, preparing interpretive materials, and instructing on their use. Article III limits the judicial power to the resolution of cases and controversies, yet the Commission does not decide cases or controversies. Nor can the responsibilities of the Commission be construed, as the Commission suggests, as simply aiding the judiciary in performing its functions. As Judge Heaney has stated:

The right to be free from the physical coercion and control embodied in a prison sentence is one of the most important rights enjoyed by citizens of a free nation. If this Court were to uphold judicial action extinguishing those rights in the guise of procedural rule-making, historical limitations on the power of the courts become meaningless.

It is difficult to imagine a more substantive exercise of authority than that delegated to the Commission—prescribing the punishment for crime.

*United States v. Estrada,* 680 F.Supp. 1312, 1328 (D.Minn.1988).

Despite the Act's placement of the Commission within the judiciary, the responsibilities of the Commission are clearly nonjudicial in nature. They are legislative and executive. In addressing whether the nature of power conferred on the judiciary was legislative or judicial, the Supreme Court has stated that:

A judicial inquiry investigates, declares and enforces liabilities as they stand on present or past facts and under law supposed already to exist. That is its purpose and end. Legislation on the other hand looks to the future and changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power.

*Keller v. Potomac Electric Power Co.,* 261 U.S. 428, 440–41, 43 S.Ct. 445, 447–48, 67 L.Ed. 731 (1923) (quoting *Prentis v. Atlantic Coast Line Co.,* 211 U.S. 210, 226, 29 S.Ct. 67, 69, 53 L.Ed. 150 (1908)). The responsibility to develop new and general rules for application outside of any specific case or controversy clearly fits the Supreme Court's definition of legislative action. Alternatively, it is possible to construe the Commission's tasks as executive. "Interpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law." *Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 3192, 92 L.Ed.2d 583 (1986).

However the Commission's responsibilities are characterized, they are clearly outside the parameters established for the judicial branch under Article III and, therefore violate the separation of powers doctrine. As James Madison cautioned, when the power to legislate is joined with the power to judge, life and liberty are exposed to arbitrary control. When the power to judge is joined with the power to execute, "the judge might well behave with all the violence of an oppressor." The Federalist No. 47, at 303. The need to protect the separate and distinct powers of each branch is evidenced by what the Supreme Court has described as "[t]he hydraulic pressure inherent within each of the sepa-

rate Branches to exceed the outer limits of its power." *Immigration & Naturalization Service v. Chadha,* 462 U.S. 919, 951, 103 S.Ct. 2764, 2784, 77 L.Ed.2d 317 (1983).

Acknowledging the constitutional violation inherent in assigning an executive function to a judicial entity and allowing its members to be removed by the President, the government asserts that Congress simply mislabeled the Commission and urges that the language placing the Commission in the judicial branch should be stricken. The government argues that the Commission is assigned the executive function of promulgating general, prospective, and binding Guidelines pursuant to a legislative delegation. They maintain that when the Commission is viewed as an executive commission, the constitutional infirmities disappear.

Unconstitutional statutory language may be severed from the statute as a whole when the excised statute will function in a manner consistent with legislative intent. *Alaska Airlines, Inc. v. Brock,* 480 U.S. 678, 107 S.Ct. 1476, 1481, 94 L.Ed.2d 661 (1987). In this case, Congress intended that "sentencing should remain primarily a judicial function." S.Rep. No. 225, 98th Cong., 2nd Sess. 159 (1983), *reprinted in* 1984 U.S.Code Cong. & Ad.News 3182, 3342. Thus, striking the designating language and moving the Commission to the executive branch would clearly violate legislative intent.

Even if the designating language were struck and the Commission were construed as an executive commission, the separation of powers doctrine would remain violated. For the same reasons that prohibit the judicial branch from undertaking the responsibilities of the executive and legislative branches, judicial officers may not hold positions in those branches in order to undertake the same responsibilities. The legislative requirement that at least three Article III judges serve on the Commission amounts to judicial legislation and/or execution of the law regardless of the branch in which the Commission is placed. Furthermore, the responsibilities assigned to the Commission seriously impair the ability of the judiciary to function in an independent and neutral fashion.

While the separation of powers doctrine requires each branch to carry out its duties independent of the others, it does not require them to remain hermetically sealed from one another. *Buckley v. Valeo,* 424 U.S. 1, 121, 96 S.Ct. 612, 683, 46 L.Ed.2d 659 (1976). Cooperation and interdependence are clearly essential to efficient and effective government. In assessing whether the interaction between the branches violates the separation of powers doctrine, the Court should examine "the extent to which [the Act] prevents the [judicial] Branch from accomplishing its constitutionally assigned functions." *Nixon v. Administrator of General Services,* 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1977) (citing *United States v. Nixon,* 418 U.S. 683, 711–12, 94 S.Ct. 3090, 3109, 41 L.Ed.2d 1039 (1974)). If it is found that the judicial branch's ability to function is impaired, the impairment must be justified by "an overriding need to promote objectives within the constitutional authority of Congress." *Id.*

The government argues that participation of Article III judges on the Commission does not affect the neutrality or independence of the judiciary for several reasons. First, the government asserts that the Commission does not perform adjudicative functions, and that the judges on the Commission sit as individuals and not in their capacity as judges. Second, the government emphasizes that participation is voluntary.

The Court is not convinced by these arguments. Participation is not fully voluntary; although an individual judge may choose not to serve on the Commission, it is mandated that three federal judges participate. The Supreme Court has held that "executive or administrative duties of a nonjudicial nature may not be imposed on judges holding office under Art. III of the Constitution." *Buckley,* 424 U.S. at 123, 96 S.Ct. at 684.

In its amicus curiae brief, the Sentencing Commission looks to *United States v. Ferreira,* 54 U.S. (13 How.) 40, 14 L.Ed. 40

(1851), to support its contention that judges may perform nonjudicial governmental functions in an individual capacity. The *Ferreira* Court did not reach the separation of powers issue. The issue before the *Ferreira* Court was whether the decision of a federal judge acting in an executive capacity could be reviewed by the Supreme Court. The specific question of whether a federal judge can perform a nonjudicial function in his individual capacity was not addressed. An earlier unpublished Supreme Court decision is instructive. *See United States v. Todd*, (U.S. Feb. 17, 1794) (summarized by Chief Justice Taney in note following *Ferreira*, 54 U.S. (13 How.) at 51). In *Todd*, the Supreme Court held that Article III judges could not hear claims in a nonjudicial capacity as commissioners.

Several circuits have recently addressed whether the appointment of judges to non-judicial commissions violates the separation of powers doctrine. *See In Re Sealed Case* (*"Sealed Case"*), 838 F.2d 476 (D.C.Cir. 1988), *cert. granted sub nom. Morrison v. Olson*, — U.S. —, 108 S.Ct. 1010, 98 L.Ed.2d 976 (U.S.1988); *In Re President's Commission on Organized Crime Subpoena of Nicodemo Scarfo* (*"Scarfo"*), 783 F.2d 370 (3d Cir.1986); *In Re Application of President's Commission on Organized Crime* (*"Scaduto"*), 763 F.2d 1191 (11th Cir.1985). In *Sealed Case*, the District of Columbia Circuit held that the separation of powers doctrine was violated by the designation of a special three-judge court to appoint and supervise independent counsel for the purpose of investigating government officials. In *Scaduto*, the Eleventh Circuit held that "[u]nder the functional test propounded in the *Nixon* cases, the conferral of such powers on federal judges violates the separation of powers." *Scaduto*, 763 F.2d at 1198. In contrast, the Third Circuit in *Scarfo* upheld the service of a judge on the President's Commission on Organized Crime.

Judges were not required to sit on the President's Commission on Organized Crime. Exec. Order No. 12,435, 3 C.F.R. 202 (1983). The duties of that commission were limited to studying organized crime and making recommendations. Unlike the Sentencing Commission, the President's Commission did not draft substantive rules to be applied by judges. The court in *Scaduto* nonetheless found that participation on the President's Commission on Organized Crime threatened the individual judges' impartiality:

> A judge who is charged with assisting and improving enforcement efforts against organized crime must adopt a pro-government perspective which is ill-suited to his obligation to be neutral in the courtroom.

763 F.2d at 1197.

The judges sitting on the Sentencing Commission have an active role in the drafting and revision of the rules and policy directives to be applied in sentencing. They have reached conclusions regarding factors relevant to the determination of sentences, the weight those factors should be accorded, and the proper interpretation and application of the Guidelines. They are in no position to consider objectively the merits of issues they considered as Commissioners if the same issues are presented by defendants in arguments before the court. While judges who have served on the Commission could recuse themselves in cases involving the Guidelines, the comprehensive nature of the Guidelines could necessitate their recusal in all criminal trials.

The independence and neutrality of those sitting on the Commission is also threatened by the President's appointment and removal powers. Just as the separation of powers doctrine prevents Congress from retaining the power to remove an officer charged with the execution of laws (except by impeachment), *Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986), it prevents Congress from vesting in the President the power to remove judicial officers from a judicial commission. The President has the power to appoint judges to the Commission with the advice and consent of the Senate and may remove them for neglect of duty, malfeasance, or good cause. 28 U.S.C. § 991(a). Insofar as service on the Commission is perceived as a source of prestige and career enhance-

ment, there is a serious risk of executive influence over the conduct of Commissioner–Judges. Independence and neutrality are further threatened by the presence on the Commission of two executive officers (the Attorney General and Chairman of the United States Parole Commission) or their designees, who may exercise additional influence over the Commissioner–Judges.

Damage to the independence and neutrality of the courts extends beyond that of the Commissioner–Judges individually. Commissioners are called upon to prepare interpretive materials and to teach the proper application of the Guidelines. In this role, the Commissioner–Judges may influence other judges by any bias they carry as a result of participating in the creation and implementation of the Guidelines. The Guidelines note that failure to follow the commentary "could constitute an incorrect application of the guidelines, subjecting the sentence to reversal on appeal." Guidelines, § 1B1.7. Thus, even if Commissioner–Judges disqualify themselves from criminal cases, the impact on all of the sentencing judges erodes the independence and neutrality of the judiciary. As the court in *Sealed Cases* noted, "intimate involvement of an Article III court in [executive duties] undermines the status of the judiciary as a neutral forum for the resolution of disputes between citizens and their government." 838 F.2d at 516.

In drafting the Sentence Reform Act of 1984, Congress sought to achieve important objectives. It is without question that the knowledge and experience of federal judges with substantial sentencing experience is a valuable asset to those seeking to improve federal sentencing procedures. The significance of these objectives coupled with the expertise of judges does not compensate for the serious threat to the proper functioning of the judiciary posed by a commission composed of both judges and non-judges, placed within the judicial branch, and charged with responsibilities outside the powers granted to the judiciary by the Constitution. For these reasons, the Commission and the Guidelines are an unconstitutional violation of the separation of powers doctrine.

## IV. PRESENTMENT OF LEGISLATION TO PRESIDENT

In a footnote, Defendants argue that the Guidelines are unconstitutional because they violate Article I of the United States Constitution. *See Immigration & Naturalization Service v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). The relevant sections of Article I provide:

All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives.

U.S. Const. art. I, § 1.

Every Bill which shall have passed the House of Representatives and the Senate, shall, before it becomes a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a Law.

U.S. Const. art. I, § 7, cl. 2.

Every Order, Resolution, or Vote to Which the Concurrence of the Senate and House of Representatives may be necessary (except on a question of Adjournment) shall be presented to the President of the United States; and before the Same shall take Effect, shall be approved by him, or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives ...

U.S. Const. art. I, § 7, cl. 3.

■ In *Chadha,* the Supreme Court found that Section 244(c)(2) of the Immigration and Nationality Act violated the strictures of Article I of the Constitution because it authorized one-House veto of legislation without presentment to the President. Insofar as *Chadha* is based upon the

bicameral requirement of Article I, it does not apply to the case before this Court. Congress provided that the Sentencing Guidelines promulgated by the Sentencing Commission would become effective six months after being presented to Congress. *See* Sentence Reform Act of 1984, Pub. Law 98–473, Title II, 98 Stat. 1987, 2031, § 235(a)(1)(B)(ii). Congress, however, did not provide for presentment of the Guidelines to the President prior to their becoming law. The Court is of the opinion that this infirmity rises to constitutional stature under the reasoning of *Chadha*.

In describing the origins or the presentment clauses, Chief Justice Warren Burger stated:

> The records of the Constitutional Convention reveal that the requirement that all legislation be presented to the President before becoming law was uniformly accepted by the Framers. Presentment to the President and the Presidential veto were considered so imperative that the draftsmen took special pains to assure that these requirements could not be circumvented.

*Chadha*, 462 U.S. at 946–47, 103 S.Ct. at 2781–82 (footnote omitted). The purposes of the presentment clause include carefully circumscribing the legislative powers conferred on Congress, checking the propensities of a particular Congress to enact "oppressive, improvident, or ill-considered measures," and assuring that a national perspective is grafted onto the legislative process. *Id.* at 946–48, 103 S.Ct. at 2781–82. Justice Burger concluded that: "[i]t emerges clearly that the prescription for legislative action in Art. I, §§ 1, 7, represents the Framers' decision that the legislative power of the Federal Government be exercised in accord with a single, finely wrought and exhaustively considered, procedure." *Id.* at 951, 103 S.Ct. at 2784; *see also id.* at 957–58, 103 S.Ct. at 2787.

As set out in the discussion of the separation of powers doctrine, the Sentencing Guidelines are clearly legislation. As such, the Guidelines are subject to the presentment requirement of Article I. *Id.* at 952, 103 S.Ct. at 2784. Neither the President's authority to appoint and remove Commissioners, nor any statement that he may make regarding the Guidelines, can substitute for the lack of presentment before the Guidelines become law. Accordingly, the Court is of the opinion that the Sentencing Guidelines violate Article I, § 7 of the Constitution because their enabling legislation provided that they were to become law without presentment to the President and the opportunity for presidential approval or veto.

Upon a finding that a statute violates Article I under the reasoning of *Chadha*, the Court must determine whether the offensive part of the statute can be severed from the remainder of the Act. *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987). The proper inquiry is whether the Act without the unconstitutional provision would function in a manner consistent with Congressional intent. When the unconstitutional provision is a legislative veto provision, the Court should examine whether the delegation of power to the executive or an independent agency is so controversial or broad that Congress would not have been willing to make the delegation without a strong oversight mechanism. *Id.* 107 S.Ct. at 1481.

The Commission's authority to create the Sentencing Guidelines is so broad and controversial that this Court is of the opinion that Congress would not have delegated that power without maintaining the ability to reject the Guidelines promulgated. Under these facts, the Court is of the opinion that Congress would not have enacted the portions of the Sentencing Reform Act of 1984 which created the Sentencing Commission and authorized it to create the Guidelines without the provision providing for legislative veto but not for presidential presentment. Accordingly, that section cannot be severed and the entire portion of the Act creating and empowering the Commission must be declared unconstitutional as violative of Article I.

## V. DUE PROCESS

Defendants allege that the Guidelines violate their due process rights in a number

of ways. First, they contend that the application of the Guidelines' mechanical sentencing structure to similarly situated defendants violates each defendant's due process right to an independent determination of his punishment. They also complain of the departure from the traditional view that rehabilitation is a factor to be considered in sentencing, *see* 28 U.S.C. § 994(k), and of the Commission's virtual elimination of straight probation in violation of the probation statute, 18 U.S.C. § 3651. Third, they claim that application of the Guidelines offends due process because, even though the Act's basic premise is that past sentencing practices were unfair because sentences were too disparate, the relevant defendant category is determined, in part, by looking at the length of any prior sentences imposed. The first of defendants' contentions is of constitutional stature. Defendants' other objections, though rationally sound, do not raise constitutional concerns.

■ A number of federal district courts have already held that the Guidelines as applied to defendants violate the due process clause. *See United States v. Frank*, 682 F.Supp. 815 (W.D.Pa.1988); *United States v. Bolding*, 683 F.Supp. 1003 (D.Md. 1988) (before six judges); *United States v. Lopez*, 684 F.Supp. 1506, 1512–14 (C.D.Cal. 1988) (en banc). Judge Donald E. Ziegler's opinion in *Frank* in this regard is very persuasive, and the Court relies heavily on the reasoning of that opinion.

The Commission has determined that age; educational and vocational skills; mental and emotional conditions; physical condition, including drug dependence and alcohol abuse; previous employment record; family ties and responsibilities, and community ties are not ordinarily relevant in determining whether a sentence should be outside the Guidelines. Guidelines, §§ 5H1.1 through 5H1.6. Race, sex, national origin, creed, religion, and socio-economic status are not relevant in the determination of the sentence. Guidelines, § 5H1.10. The Court is of the opinion that the Guidelines severely restrict the sentencing judge's ability to tailor the punishment to the individual defendant; and that this restriction also constitutes a violation of defendants' due process rights. The mitigating circumstances upon which a Court may base a departure are so limited by the amended 18 U.S.C. § 3553(b) that the Court is restricted in tailoring the sentence to a defendant even when departing from the Guidelines.

In addressing whether defendants' due process rights have been violated, the Court must first determine whether defendants have a due process right during sentencing. If the answer is yes, then the Court must determine whether the Guidelines provide the process that is due. *See Morrissey v. Brewer*, 408 U.S. 471, 481–90, 92 S.Ct. 2593, 2600–04, 33 L.Ed.2d 484 (1972).

The due process clause of the Fifth Amendment provides that "[n]o person shall be ... deprived of life, liberty, or property, without due process of law." Procedural due process guarantees an individual an opportunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). Every defendant has a legitimate interest in the character of the procedure which leads to the imposition of his sentence. *Gardner v. Florida*, 430 U.S. 349, 358, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1977). Whether any procedural protections are due depends upon the extent to which an individual will be "condemned to suffer grievous loss." *Morrissey*, 408 U.S. at 481, 92 S.Ct. at 2600 (quoting *Joint Anti–Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 168, 71 S.Ct. 624, 647, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring)). The termination of a defendant's liberty by sentencing him to a term of incarceration unquestionably inflicts grievous loss upon the defendant.

In *Frank*, Judge Ziegler noted that sentencing is composed of two core determinations: a determination of the facts and circumstances surrounding the individual and the offense, and a determination of the relevance of each fact and the weight that it should be accorded. *Frank*, at 818. His-

torically, courts have afforded defendants the opportunity to rebut information relied upon by the court in sentencing, and thereby, have protected defendants' ability to affect the court's assessment of that evidence in imposing sentence. *Id.* at 818–819. Judge Ziegler concluded that:

> If due process protects a defendant's ability to challenge facts presented to a district court at sentencing, it must also protect the ability to challenge the weight accorded to those facts. Without such protection, the risk of an improper sentence is just as great as when a defendant is without the opportunity to rebut ·facts presented to a district court.

*Id.* at 819.

The United States Supreme Court has determined that a defendant does not have a due process right to limit the factors which a judge may consider in assessing punishment. *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949); *see also McMillan v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986) (not unconstitutional for state legislature to allow trial court to determine specific fact at sentencing alone). In *Williams,* the defendant unsuccessfully invoked the due process clause as support for his argument that the sentencing judge could not consider information outside that presented in the courtroom. Writing for the Court, Justice Black noted that, without the ability to gather information about the individual being sentenced, the judge was more likely to err in imposing a sentence. Justice Black concluded that the sentencing judge should be in possession of the fullest amount of knowledge possible. *Williams,* 337 U.S. at 247, 69 S.Ct. at 1083. He quoted with approval the following comments of Judge Lewis B. Schwellenbach:

> The knowledge of the life of a man, his background and his family, is the only proper basis for the determination as to his treatment. There is no substitute for information. The sentencing judge in the federal court has the tools with which to acquire that information. Failure to make full use of those tools cannot be justified.

*Id.* at 249 n. 14, 69 S.Ct. at 1084 n. 14; *see also id.* at 248 n. 10, 69 S.Ct. at 1083 n. 10. Section 5H1 of the Guidelines specifically removes from the consideration of the sentencing judge many elements of "the life of a man, his background and his family," and this lack of information greatly inhibits the Court's ability to impose appropriate sentences.

The Court also finds guidance in Supreme Court decisions which mandate that a sentencing judge or jury cannot be restricted from considering all relevant mitigating circumstances when the death penalty is a possibility. *See Hitchcock v. Dugger,* —— U.S. ——, 107 S.Ct. 1821, 95 L.Ed. 2d 347 (1987); *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). Some distinctions may be appropriate between procedures for capital and noncapital cases because the sentences differ in kind. The Court is of the opinion, however, that the defendant's ability to inform the Court of circumstances and factors unique to him and the Court's ability to consider such factors should not be determined by whether the defendant faces a maximum punishment of death, a life sentence, or a lesser term of incarceration. *See Williams,* 337 U.S. at 251, 69 S.Ct. at 1085 (court declined to draw constitutional distinction regarding procedure for obtaining information relevant to sentencing when death penalty imposed). The Court is therefore of the opinion that each of the defendants has a due process right to participate in his sentencing process by being given the fullest opportunity to affect the sentencing judge's weighing of factors relevant to the sentence to be imposed against him.

■ When a court assesses what process is due under the circumstances, it must consider: (1) the nature of the individual interest; (2) the risk of error associated with present procedures; (3) the value of additional safeguards; and (4) the government's interests, including the function in-

volved and avoidance of undue fiscal or administrative burdens. *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976); *see also Cafeteria & Restaurant Workers Union v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961); *Frank,* at 818–819.

Defendants' individual interests are great because sentencing necessarily threatens their liberty interests. Moreover, as Justice Black has so eloquently expressed in *Williams,* that great risk of error exists when a judge is denied the opportunity to consider all relevant factors in imposing a sentence on an individual. If a sentence is imposed under procedures that restrict the consideration of information about the individual, then there is substantial risk that an unjust and inappropriate sentence will be imposed. The value of additional procedural safeguards is immense. Procedures which would allow all relevant information about the individual to be brought before the judge and considered by him would substantially increase the probability that a just and appropriate sentence will be imposed.

The Court recognizes that the government's interests are also substantial. A defendant has been found guilty of a crime against the people and this warrants imposing sentence. Congress has also expressed the interest of alleviating the disparity between sentences imposed by different federal courts on similar defendants convicted of similar crimes. The government does not have an interest in achieving this end by requiring courts to impose sentences that are inappropriate and unjust because the court has been denied the opportunity to weigh relevant information. The government's interest in avoiding fiscal and administrative burdens is not threatened by a system which both grants the defendant the opportunity to influence the judge's weighing of factors in determining the sentence, as well as greater discretion to the sentencing judge to tailor the punishment to the individual. Procedures which would protect defendants' due process rights need not be expensive or time-consuming.

The *Bolding* court refrained from ruling that defendants are constitutionally entitled to individualized sentences. At 1005. Despite a difference of opinion on that ground, this Court joins in the following statement by the United States District Judges of the District of Maryland in *Bolding:*

> [W]hen a definite sentence is not statutorily mandated, a defendant being deprived of his liberty pursuant to a statute which sets a sentencing range is constitutionally entitled to an articulated exercise of discretion by the judge before whom he appears rather than to the mechanical application of formulae adopted by non-constitutional commissioners invisible to him and to the general public. The essence of due process is accountability, reason and a fair opportunity to be heard. These cannot be replaced by any administrative code, however extensively considered or precisely drawn.

*Id.*

In sum, the Court is of the opinion that the Guidelines, by restricting the information which this Court may consider in sentencing each of the six defendants, and by limiting each defendant's ability to attempt to influence the Court in the determination of that defendant's sentence, do not provide the process which is due the defendants in the sentencing process.

## VI. SEVERABILITY

Having determined that the Commission and the Guidelines are unconstitutional, the Court must now determine whether the remainder of the Sentencing Reform Act of 1984 can be severed from the unconstitutional portions of the Act. As the Supreme Court has instructed, "a court should refrain from invalidating more of a statute than is necessary.... '[W]henever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of this court to so declare, and to maintain the act in so far as it is valid.'" *Regan v. Time, Inc.,* 468 U.S. 641, 652, 104 S.Ct. 3262, 3268, 82 L.Ed.2d 487 (1984) (plurality opinion) (quoting *El Paso & Northeastern Ry. Co. v.*

**1004**

*Gutierrez,* 215 U.S. 87, 96, 30 S.Ct. 21, 24, 54 L.Ed. 106 (1909)).

The Court hereby adopts Judge Heaney's discussion regarding severability in *United States v. Estrada,* 680 F.Supp. at 1336–38; *see also United States v. Fonseca,* 686 F.Supp. 296, 302 (S.D.Ala. 1988). The *Estrada* court held that the Guideline provisions were severable from the rest of the statute and that the remainder of the Act should stand.

The Sentencing Reform Act provides for fundamental and revolutionary changes in the sentencing process. Among the changes that can be preserved by severing the guidelines provisions are:

> (a) the detailed set of principles or sentencing standards which narrow the judge's discretion in imposing sentences;
>
> (b) the requirement of 'real time' sentences under which convicted defendants will be obligated to serve the full sentence imposed by the court less good time credits earned for satisfactory behavior while in prison;
>
> (c) the requirement that judges state their reasons for imposing particular sentences, thus opening up the sentencing process to the public; and
>
> (d) the appellate review of sentences.

*Estrada,* 680 F.Supp. at 1336. This Court disagrees in part with Judge Heaney's conclusions regarding the severability of the Act's provisions for appellate review, and holds that only the portions of the Act providing for appeals of sentences imposed in violation of the law should survive the Court's ruling on the unconstitutionality of the Act and the Guidelines. *See* 18 U.S.C. §§ 3742(a)(1) and (b)(1).

The Court concludes that the unconstitutional portions of the Sentencing Reform Act of 1984 regarding the creation of the Sentencing Commission and the promulgation of Sentencing Guidelines can be severed from the rest of the Act, and that the remaining constitutional portions of the Act may stand on their own.

Pursuant to this ruling, and until further clarification and direction from appellate courts, the Court will sentence persons convicted of offenses occurring on or after November 1, 1987, considering all relevant factors as if the offense had been committed before November 1, 1987 and with recognition of the current unavailability of parole.